Lauren M. Rule (ISB # 6863), *pro hac vice*
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)
lrule@advocateswest.org

Erik B. Ryberg (AZB # 023809)
445 W. Simpson Street
Tucson, AZ 85701
(520) 622-3333
ryberg@seanet.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>BUREAU OF LAND MANAGEMENT, )<br>)<br>Defendant. ) | Case No.: 08-cv-1472-MHM<br><br>**FIRST AMENDED COMPLAINT**<br>**(Declaratory and Injunctive Relief)** |

## INTRODUCTION

1.      Plaintiff Western Watersheds Project ("WWP") challenges Defendant Bureau of Land Management's ("BLM") mismanagement of the Sonoran Desert National Monument with respect to livestock grazing.  BLM continues to authorize livestock grazing on the monument that damages the soil, plant, wildlife, and historic resources there, in violation of the Presidential proclamation that set aside this monument to protect the values of this special desert ecosystem.

2.      The Sonoran Desert is the most biologically diverse desert in North America.  President Clinton established the 496,337 acre Sonoran Desert National Monument in January 2001 to protect the biodiversity of plants and animals and their

habitats, as well as the numerous historic sites, found in this desert setting.  According to the proclamation that established the monument, this newly protected area in the heart of Arizona has "an extraordinary array of biological, scientific, and historic resources" that provide for a "spectacular diversity of plant and animal species," including imperiled species such desert bighorn sheep, Sonoran pronghorn, Sonoran desert tortoise, and many other birds, reptiles, and plants.

3.     Recognizing the harmful impacts that livestock grazing was having on this ecosystem, the proclamation closed all grazing allotments in the southern portion of the monument, and allowed grazing to continue on the northern portion of the monument **only** if BLM determined that grazing is compatible with the "paramount purpose of protecting the objects identified in this proclamation."  It also required BLM to prepare a management plan that addresses the actions "necessary to protect the objects identified in the proclamation."

4.     More than seven years later, BLM still has not determined that livestock grazing is compatible with protecting the native habitats, vegetation, wildlife, and historic sites on the monument, nor completed a management plan, yet it continues to authorize grazing.  Despite scientific studies showing that livestock are degrading soils, reducing plant diversity, increasing weeds and non-native plants, and damaging wildlife habitat on the monument, BLM renewed numerous grazing permits for additional ten-year terms in 2005 and has continued to issue annual authorizations for grazing on allotments within the northern portion of the monument.

5.     BLM has failed to make the mandatory determination as to whether livestock grazing is compatible with the stated purpose of protecting the fragile desert ecosystem, and has failed to complete the required management plan, in violation of the Sonoran Desert National Monument proclamation.  Furthermore, BLM's continuing authorization of grazing on the monument through permit renewals and subsequent annual authorizations despite no determination that this grazing is compatible with monument objectives, and studies showing that in fact this grazing is damaging

monument resources, is arbitrary and capricious and contrary to the proclamation.

6.     WWP thus seeks judicial review and relief compelling the BLM to conduct expeditiously the required livestock grazing compatibility determination and complete a monument management plan.  WWP also seeks to set aside the renewed grazing permits and annual authorizations until BLM has properly determined that grazing is compatible with the purpose of protecting the resources on the Sonoran Desert National Monument.

## JURISDICTION AND VENUE

7.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Antiquities Act, 16 U.S.C. § 431, and the Sonoran Desert National Monument Proclamation, Proclamation No. 7397, 66 Fed. Reg. 7354; the Administrative Procedure Act, 5 U.S.C. § 701 et seq.; the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.; and the Equal Access to Justice Act, 28 U.S.C. § 2214 et seq.  An actual, justiciable controversy now exists between Plaintiff and Defendant, and the requested relief is therefore proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 701-06.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district and a substantial part of the public lands and resources at issue are located within this district.

9.     The Federal Government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## PARTIES

10.     Plaintiff WESTERN WATERSHEDS PROJECT ("WWP") is a regional, membership, not-for-profit conservation organization, dedicated to protecting and conserving the public lands and natural resources of watersheds in the American West. WWP has offices throughout the West, including in Tucson, Arizona, and more than 1,300 members located throughout the United States.  Through agency proceedings, public education, scientific studies, and legal advocacy conducted by its staff, members,

1    volunteers, and supporters, WWP is actively engaged in protecting and improving plant

2    and animal communities and other natural resources and ecological values of western

3    watersheds.

4           11.    WWP has actively participated in management of livestock grazing on the

5    Sonoran Desert National Monument through letters, comments, field trips, and oral

6    communications to the BLM, expressing its concerns over livestock grazing on the

7    monument. WWP staff and members use and enjoy the wildlife, public lands, and other

8    natural resources on the Sonoran Desert National Monument for many health,

9    recreational, scientific, spiritual, educational, aesthetic, and other purposes.  WWP staff

10    and members pursue activities such as hiking, wildlife viewing, biological and botanical

11    research, photography, and spiritual renewal on the Sonoran Desert National Monument.

12    Livestock grazing that degrades this fragile ecosystem impairs the use and enjoyment of

13    this monument by WWP staff and members.

14           12.    WWP staff, members, and supporters will continue to visit the Sonoran

15    Desert National Monument in the future for many purposes such as hiking, wildlife

16    viewing, photography, scientific study, spiritual renewal, and to otherwise enjoy the

17    natural scenery and beauty of the Sonoran Desert.  WWP, both organizationally and on

18    behalf of its staff, members, and supporters, has an interest in the preservation and

19    protection of the Sonoran Desert National Monument, which interest is directly harmed

20    by Defendant's violations of law challenged herein.

21           13.    The above-described conservation, recreational, scientific, and aesthetic

22    interests of WWP and its staff, members and supporters have been, are being, and, unless

23    the relief prayed for is granted, will continue to be adversely affected and irreparably

24    injured by Defendant's violations of law.  WWP has no adequate remedy at law, and thus

25    the requested relief is appropriate.

26           14.    Defendant BUREAU OF LAND MANAGEMENT ("BLM") is an agency

27    or instrumentality of the United States, and is charged with managing the public lands

28    and resources of the Sonoran Desert National Monument, in accordance and compliance

with federal laws and regulations.

## FACTUAL BACKGROUND

**A.      Sonoran Desert National Monument**

15.     The Sonoran Desert is a hot, arid region that stretches between southwest Arizona, southeast California, and northern Mexico.  Although it is the hottest of our North American deserts, the Sonoran Desert has remarkably high biological diversity for both plants and animals.  This desert is well-known for its "forests" of saguaro cactus, but is also home to other trees such as paloverde, desert ironwood, and mesquite, a variety of shrubs, and many species of ephemeral plants that arise after seasonal rains.

16.     These varied plant communities provide habitat for a plethora of wildlife. The Sonoran Desert has over 2000 native plant species in total, many of which are endemic to the Sonoran Desert, as well as 60 mammals, 350 birds, 20 amphibians, and more than 100 reptiles that inhabit the area.  The Sonoran Desert is one of the richest and most exceptional birding areas in the United States.

17.     One of the defining characteristics of the upland Arizona portion of the Sonoran Desert is the biseasonal rainfall pattern, with winter rains coming from the Pacific and summer moisture coming from tropical monsoons.  Years with good precipitation result in large populations of annual plants while other years result in drought and much less annual production.  The mild winters rarely experience frost and thus almost half of the biota of this region is tropical in origin.

18.     Livestock grazing, off-road vehicle use, encroachment of agriculture and human development, and introduction of non-native species are the primary threats facing the Sonoran Desert ecosystem.

19.     Amidst this unique ecosystem, President Clinton established the Sonoran Desert National Monument pursuant to his authority under the Antiquities Act.  In Presidential Proclamation 7397, President Clinton set aside this area to protect its resources from development and degradation.

20.    The monument is located about 60 miles southwest of Phoenix, Arizona and encompasses 496,337 acres.  Three mountain ranges dominate the landscape on the monument, with intervening valleys that biologically link these ranges.

21.    The proclamation begins by noting that the monument is a "magnificent example of untrammeled Sonoran desert landscape."  This desert ecosystem has "an extraordinary array of biological, scientific, and historic resources.  The most biologically diverse of the North American deserts, the monument consists of distinct mountain ranges separated by wide valleys, and includes large saguaro cactus forest communities that provide excellent habitat for a wide range of wildlife species."

22.    The proclamation continues by discussing the "spectacular diversity of plant and animal species" here.  The higher peaks on the monument contain unique woodland communities, while lower elevation lands "offer one of the most structurally complex examples of paloverde/mixed cacti association in the Sonoran Desert."   The proclamation highlights the saguaro cactus forests, stating that these forests, with their signature saguaro plants together with a wide variety of other trees, shrubs, and herbaceous plants, are "an impressive site to behold" and "a national treasure."

23.    In discussing the lower elevation, flatter areas of the monument, the proclamation notes the creosote-bursage plant community, which thrives in open expanses between mountain ranges and acts as a connector to other plant communities.  The monument also contains desert grasslands as well as washes, which support denser vegetation such as mesquite, ironwood, paloverde, desert willow, and a variety of herbaceous plants.  This vegetation provides dense cover for bird species for nesting, foraging, and escape, and "birds heavily use the washes during migration."

24.    Of particular relevance here, the proclamation remarks on the rich diversity, density, and distribution of plants in the Sand Tank Mountains area on the monument, which is due to the management regime in place in that particular area that has excluded livestock grazing there for more than fifty years.[1]

---

[1] This area was withdrawn for military purposes in 1941.  Pursuant to the proclamation,

25.     Wildlife diversity is also a focal point of the proclamation.  "The diverse plant communities present in the monument support a wide variety of wildlife, including the endangered Sonoran pronghorn, a robust population of desert bighorn sheep, especially in the Maricopa Mountains area, and other mammalian species such as mule deer, javelina, mountain lion, gray fox, and bobcat."

26.     The proclamation makes note of other mammals, birds, reptiles, and amphibians on the monument.  It mentions several bat species found here, including the endangered lesser long-nosed bat.  More than 200 species of birds are found on the monument as well as many raptors and owls.  Reptiles such as the red-backed whiptail and the Sonoran desert tortoise inhabit the monument, and 25,000 acres of land in the Maricopa Mountains has been designated as critical habitat for the desert tortoise.  The Sonoran green toad is also found in parts of the monument.

27.     In addition to the biological resources on the monument, the proclamation also stresses the importance of the "many significant archaeological and historic sites, including rock art sites, lithic quarries, and scattered artifacts."  The monument contains remains of prehistoric travel corridors and villages as well as remnants of several important historic trails, including the Juan Bautista de Anza National Historic Trail, the Mormon Battalion Trail, and the Butterfield Overland Stage Route.

28.     In light of these biologic and historic values, President Clinton used his authority under the Antiquities Act to create the Sonoran Desert National Monument "for the purpose of protecting the objects identified above."

29.     To further this purpose, the proclamation prohibited motorized and mechanized vehicle use off roads and withdrew the land from any form of entry, sale, leasing, or other disposition, including for mining or mineral development.

30.     The proclamation prohibited BLM from renewing grazing permits for all allotments within the monument south of Highway 8 at the end of their term; and stated

the military withdrawal terminated on November 6, 2001 and BLM has assumed management responsibility.

that grazing north of Highway 8 "shall be allowed to continue only to the extent that the Bureau of Land Management determines that grazing is compatible with the paramount purpose of protecting the objects identified in this proclamation."[2]

31.     According to the proclamation, the BLM must also prepare a management plan that addresses the actions, including road closures or travel restrictions, necessary to protect the objects identified in the proclamation.  In light of the proclamation designating this area as a national monument, BLM no longer manages this area on a multiple use basis but instead must manage it for the protection of the objects of interest identified in the proclamation.

32.      The Sonoran Desert National Monument Proclamation was signed by President Clinton on January 17, 2001.

**B.      Livestock Grazing on the Monument**

33.     The majority of the land now encompassed within the Sonoran Desert National Monument has been grazed by livestock for many decades.  The Sand Tank Mountains area, mentioned above, in the southwest corner of the monument is the only substantial area that has not been impacted by grazing over the past fifty years.

34.     All or parts of ten grazing allotments occur on the monument.  The allotments south of Highway 8 consist of the Vekol, South Vekol, Table Top, and Santa Rosa allotments as well as a portion of the Big Horn allotment.  Pursuant to the proclamation, the Vekol, South Vekol, and Table Top allotments were closed on February 29, 2008 and the Santa Rosa and southern portion of the Big Horn allotments are scheduled to close on February 28, 2009. To the north of Highway 8 is the remainder of the Big Horn allotment, and the Lower Vekol, Conley, Hazen, Beloat, and Arnold allotments.

35.     Grazing permits for these allotments allow for two types of grazing: perennial and ephemeral.  Perennial grazing authorization allows for a certain number of

---

[2] Highway 8 crosses the Monument from east to west.  Slightly more than half of the Monument occurs north of the Highway.

cattle to graze the allotment during a certain period of time each year for the ten year term of the permit.

36.   Ephemeral grazing authorization allows for additional grazing on a seasonal basis when rainfall provides adequate forage.  Depending on the seasonal forage production, BLM authorizes a certain number of cows to graze for a limited time in that season.  On the monument, ephemeral grazing occurs if seasonal winter or summer rains provide sufficient forage production.

37.   Of the allotments on the monument, the Santa Rosa and Arnold allotments have only ephemeral grazing permits.  The remainder of the allotments have permits that authorize both perennial and ephemeral grazing.  Each of the perennial permits has a year-long season of use, meaning that the allotted number of cattle can use the allotment all year, and varies in number of cattle permitted from 70 cattle up to 559 cattle.  Each permit also identifies the permitted animal unit months, or AUMs, allowed on an allotment.  An AUM is the amount of forage needed to sustain a cow and calf pair for one month.  The perennial permits for the allotments on the monument range from 832 to 6104 AUMs.

38.   The ephemeral grazing that occurs on the monument varies by year, with BLM often allowing hundreds, and in some cases thousands, of cattle to graze for several weeks or months under ephemeral permits.  This type of permit authorizes grazing of AUMs in addition to the AUMs authorized by the perennial permits, which has been as many as several thousand additional AUMs on the monument allotments.

39.   Livestock grazing on the area that is now within the Sonoran Desert National Monument has caused significant impacts to the natural and cultural resources there.  Most of the grazing occurs on the lower elevation lands within desert scrub and cactus communities, mesquite woodlands, and floodplains and washes.  The higher elevation mountain uplands and rocky slopes receive little grazing use.  This dichotomy in use has resulted in heavier impacts to the vegetation and soils of the lowlands while the uplands have undergone much less disturbance.

40.     Grazing use in the lowlands has resulted in compaction and erosion of soils, destruction of biological soil crusts, reduction in vegetation cover, loss of native plant diversity, increase in non-native plants, and altered plant community structure and composition.  This damage to vegetation also degrades wildlife habitat.

41.     Livestock grazing compacts soils, making the soils denser and less permeable.  Compacted dense soils inhibit water infiltration and increase surface water run-off, thereby increasing erosion of surface soil.  Depletion of vegetative cover by livestock and the resultant increase in bare ground also increases soil erosion.  This loss of vegetation cover and soil has long-term impacts to soil and plant productivity and the hydrology of watersheds.

42.     Biological soil crusts on the soil surface are important assets to plant growth, enhancing plant uptake of nutrients and nitrogen, which is particularly important in nitrogen-limited desert ecosystems.  These crusts provide favorable sites for germination of native plant seeds, and hinder germination of non-native seeds that prefer invading disturbed sites.  Soil crusts also help prevent water and wind erosion.  Livestock trampling and compression of soils damages or destroys these crusts, which results in impaired ecological functions.  Recovery of soil crusts from disturbance can take years or even decades.

43.     Plant community structure on the Sonoran Desert National Monument generally consists of an understory of perennial and annual grasses and forbs[3], a mid-story of shrubs, cacti, and small trees, and an overstory of somewhat larger trees as well as columnar cacti like saguaro.  In the driest areas of the monument, trees and tall shrubs are confined to drainages.  Because of the dry climate, plant productivity is low, particularly during periods of drought.

44.     Cattle usually prefer to eat grasses, but will also eat forbs and browse shrubs and small trees if grasses are unavailable.  Grazing this vegetation reduces plant

---

[3] Forbs are broad-leaved herbaceous plants other than grasses, sedges, or rushes, and include a variety of wildflowers.

cover and density, increasing the amount of bare ground.  Because of normally low productivity in the desert, vegetation may not recover unless grazing is discontinued. Cattle also alter the natural structure of communities by grazing the understory or mid-story more heavily, reducing the abundance of plants in the understory and favoring expansion of trees and shrubs.

45.     Grazing significantly reduces native plant diversity, changing the composition of the plant community by eliminating plants that are sensitive to grazing and allowing only those plants more adapted to disturbance to grow.  Likewise, grazing replaces native species, especially native grasses, with non-native invasive species because cattle prefer the native species, selecting them for eating and allowing invasive species to spread.  These non-native species often increase the risk of wildfire.

46.     Livestock grazing is detrimental to saguaro cactus communities because cattle trample and eat saguaro seedlings, and graze understory plants and grasses that provide protection and shade for saguaro seedlings.  Grazing also increases wildfire risk through spread of exotic species, and saguaro cacti are intolerant of wildfire.

47.     These impacts to soils and plant communities occur most severely in proximity to watering points and riparian areas where cattle congregate to find water, food, and shade.  In contrast, upper elevation areas and rocky slopes that are much less accessible to cattle have greater plant diversity, greater abundance of rare plants, more natural plant composition and structure, and less soil disturbance.

48.     Cattle grazing degrades wildlife habitat for many species of wildlife. Consumption and trampling of vegetation by livestock reduces forage and cover for many animals, including birds, small mammals, insects, and other native herbivores like deer and pronghorn.  Many animals are highly dependent on seasonal pulses of plant productivity that occur in the Sonoran Desert in response to rain events, and ephemeral grazing that occurs during those same periods is particularly detrimental to the survival and reproduction of those species.  Many wildlife species also heavily rely upon riparian areas and washes for protection and food, and livestock typically congregate there,

1    removing forage and eliminating protective cover for wildlife.

2       49.    Grazing structures such as water developments and fences can indirectly

3    harm wildlife.  Water developments that remove water from washes impact downgradient

4    riparian vegetation, which is heavily relied upon by wildlife for food and cover.  These

5    developments also create "hot spots" of extreme vegetation and soil degradation by

6    livestock and high levels of non-native plants that are usually of lower value for wildlife.

7    Fences also fragment habitat and limit movement of large mammals.

8       50.    Many of the species directly named in the Sonoran Desert National

9    Monument proclamation are impacted by livestock grazing, such as Sonoran pronghorn,

10   Sonoran desert tortoise, and desert bighorn sheep. For instance, cattle compete with

11   pronghorn for forage and reduce hiding cover for fawns.  They eliminate nutritionally

12   important forage for desert tortoise adults and hatchlings, which depend heavily on

13   availability of plants after seasonal rainfall events.  Thus, ephemeral grazing is

14   particularly detrimental to the tortoise.  Livestock grazing impacts desert bighorns by

15   competing with bighorns for forage, impairing their movements with fences, and

16   excluding bighorns from suitable habitat, movement corridors, or water sources because

17   cattle are using those areas and bighorns often avoid cattle.

18      51.    Finally, cattle damage cultural and historical sites by trampling artifacts and

19   other features on the soil surface.  They also induce changes in plants and soils that lead

20   to erosion and gullying which can displace or bury archaeological sites.

21   **C.    BLM Management of Grazing on the Monument**

22      52.    BLM is the agency responsible for managing the Sonoran Desert National

23   Monument.  This entails managing livestock grazing on the monument, among other

24   things.  Since the establishment of the monument in 2001, BLM has made no changes in

25   grazing management on the monument allotments north of Highway 8 despite studies and

26   data showing that grazing is impairing monument resources.  BLM also has never

27   completed the compatibility determination required under the proclamation nor a

28   management plan for the monument.

53.     Not long after the Sonoran Desert National Monument was established, BLM entered into contracts with The Nature Conservancy and the Pacific Biodiversity Institute to study the ecological condition of and livestock grazing impacts to the monument.  Several reports were issued as a result of these contracts.

54.     The Pacific Biodiversity Institute studies assessed the natural communities and ecological condition of the Sonoran Desert National Monument and adjacent areas. Field work for these studies occurred from 2002 to 2006 and several reports were completed, which included maps of the various natural communities on the monument as well as assessments of the ecological condition of each community and the stressors that affected each community.

55.     The results of these studies indicated that the communities most impacted by livestock grazing had the most disturbance in the form of low vegetation cover, low native species diversity, high levels of non-native species—especially in herb and grass cover, and soil erosion and compaction.  These communities were at the lower elevations of the monument and consisted of creosote-Bursage desert scrub, Paloverde-mixed cacti-mixed scrub on Bajadas, Mesquite woodlands, valley xeroriparian areas, and braided channel floodplains.

56.     The creosote-Bursage desert scrub community, one of the primary communities on the monument, is where most of the livestock grazing occurs and likewise is one of the most disturbed communities.  As noted by the report, "[t]he influence (stresses) of livestock extends throughout most of the community, as few of the regions we visited within the study area are without some indication of livestock influence."

57.     In contrast, the communities least accessible to livestock, such as the higher elevations of Paloverde-mixed cacti-mixed scrub on rocky slopes, mountain uplands, and rocky outcrops, had the least disturbance, with few exotic species, high diversity of native plants, and little soil disturbance.  However, in 2005 and 2006, signs of livestock use were seen in these higher elevation areas, indicating an increasing risk of livestock

impacts to these less accessible areas.

58.    The native grasslands also showed a contrast between grazed and ungrazed areas, with the grazed grasslands on the monument showing significant disturbance and poor conditions while ungrazed grasslands on adjacent property were in much better condition and had much higher levels of native grasses.  In looking specifically at grazed valley riparian areas, the study noted that these areas had a high abundance of exotic grasses and very low abundance of native grasses, and that the native grass cover was being reduced by livestock activity.

59.    The reports also documented that within communities most affected by grazing, the areas around livestock congregation areas, such as water sources and other range developments, had the most severe degradation, with highly altered vegetation composition and structure and altered soil surfaces.

60.    The report issued by The Nature Conservancy in February 2005 assessed existing research on impacts of livestock grazing in the Sonoran desert and its implications for grazing management on the monument.  This report considered the prior Pacific Biodiversity Insitute study on the monument as well as numerous other studies conducted in desert ecosystems.

61.    Based on the synthesis of all existing research, the February 2005 report described livestock grazing impacts to plants, soils, wildlife, and cultural resources in the Sonoran desert.  It then assessed current grazing management strategies used by BLM and other land managers.

62.    The report stated that:

The unique ecological characteristics of the Sonoran Desert require specific attention when considering development and implementation of a grazing management strategy.  Current approaches to grazing in the Sonoran Desert mostly seem to follow the conceptual thinking underlying grazing management strategies developed and tested for ecosystems typically of higher productivity and of significantly different ecosystem dynamics.  As a result, **no currently described approach, including continuous grazing and**

**each of the specialized grazing systems, is completely applicable to or appropriate for the Sonoran Desert ecosystem within the current formulations.**

63.     In sum, this report concluded that no known system of grazing is compatible with protecting the Sonoran Desert ecosystem and its resources.

64.     BLM has also collected some data on the allotments within the monument and found altered plant composition compared to natural values on many transects, with some areas of moderate to high alteration.  This alteration often consists of higher than normal percentage of shrub and tree cover.  Some transects also showed very low overall vegetation cover, with results as low as zero to four percent total vegetation cover.  And BLM documented several species of non-native grasses on numerous allotments, particularly red brome, filaree, and Mediterranean grass.

65.     Despite all of these studies showing that livestock grazing is having significant impacts on resources on the monument, including resources specifically named in the monument proclamation such as the creosote-bursage and paloverde-mixed cacti plant communities, saguaro cactus forests, desert washes, and habitat that supports a variety of wildlife species, BLM has not changed grazing management at all for the allotments north of Highway 8 and has not even conducted the compatibility determination required under the proclamation.

66.     Instead, upon expiration of the permits for those allotments in 2005, BLM simply renewed the permits for another ten years, carrying forth the same grazing management and level of use without ever determining that such grazing is compatible with the monument objects.  Since then, BLM has issued annual authorizations for both perennial and ephemeral grazing on those allotments.

67.     In contrast, upon expiration of permits for allotments south of Highway 8, BLM did not renew those permits and terminated grazing on those allotments as required

by the proclamation.[4]

68.     For the past several years Plaintiff and other groups have expressed their concern about the resource damage that is occurring on the monument due to livestock grazing and the need for a compatibility determination.  Letters to the BLM described overgrazed and degraded conditions on the monument and documented numerous livestock carcasses strewn across the almost barren landscape, and repeatedly asked BLM to conduct the necessary compatibility determination.

69.     BLM has responded by asserting that it will include the compatibility determination within a new Resource Management Plan ("RMP") for the monument.  However, BLM has repeatedly delayed issuing the RMP and has yet to release even a draft.  Furthermore, it is not unusual for BLM to take an additional two or more years between issuing a draft RMP and a final RMP and Record of Decision.  Thus, a final management plan and compatibility determination could still be years away from implementation.

70.     Seven and a half years have already passed since President Clinton issued the proclamation establishing the Sonoran Desert National Monument and requiring the BLM to determine whether grazing on allotments north of Highway 8 is compatible with the purposes of the monument and prepare a management plan that includes actions needed to protect monument resources.  BLM has failed to complete these mandatory duties and no clear timeframe exists for their completion and implementation.  In the meantime, BLM has renewed grazing permits for another ten years and issued annual grazing authorizations for these very allotments, allowing the same grazing to continue that studies have found to be damaging resources and that is not compatible with protecting monument objects.

---

[4] Permits for two additional allotments south of Highway 8 will expire in February 2009 and BLM has sent notice that those permits also will not be renewed and grazing will be terminated on those allotments as well.

# FIRST CLAIM FOR RELIEF
### Violation of the Sonoran Desert National Monument Proclamation for Failure to Complete a Compatibility Determination and Management Plan

71.     Plaintiff realleges and incorporates by reference the preceding paragraphs.

72.     This first claim for relief challenges the BLM's failure to act with respect to the following discrete mandatory duties:

        A.     Issuing a determination as to whether livestock grazing is compatible with the purpose of protecting the natural and historic resources on the Sonoran Desert National Monument; and

        B.     Issuing a management plan that addressed the actions necessary to protect the natural and historic resources on the Sonoran Desert National Monument.

73.     These duties are required by the Sonoran Desert National Monument Proclamation signed on January 17, 2001.  Sonoran Desert National Monument Proclamation, Proclamation No. 7397, 66 Fed. Reg. 7354  (Jan. 22, 2001).

74.     This claim is brought pursuant to the judicial review provision of the Administrative Procedure Act, 5 U.S.C. § 706(1).

75.     By failing to complete a compatibility determination and a management plan, BLM has unlawfully withheld and/or unreasonably delayed these mandatory decisions under the Administrative Procedure Act, which has caused or threatens serious prejudice and injury to Plaintiff's rights and interests.

# SECOND CLAIM FOR RELIEF
### Violation of the Sonoran Desert National Monument Proclamation for Reauthorizing Grazing Prior to Conducting a Compatibility Determination

76.     Plaintiff realleges and incorporates by reference the preceding paragraphs.

77.     This second claim for relief challenges BLM's reauthorization of grazing, including renewal of ten-year livestock grazing permits and subsequent annual grazing

authorizations, for allotments north of Highway 8 without first determining that such

grazing is compatible with the purposes of the Sonoran Desert National Monument, as

required by the monument proclamation.  Sonoran Desert National Monument

Proclamation, Proclamation No. 7397, 66 Fed. Reg. 7354  (Jan. 22, 2001).

78.     This claim is brought pursuant to the judicial review provision of the

Administrative Procedure Act, 5 U.S.C. § 706(2).

79.     BLM's reauthorization of livestock grazing through permit renewals and

continuing annual authorizations in violation of the Sonoran Desert National Monument

proclamation is arbitrary, capricious, an abuse of discretion, and not in accordance with

law under the Administrative Procedure Act, which has caused or threatens serious

prejudice and injury to Plaintiff's rights and interests.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court grant it the following relief:

A.     Adjudge and declare that the BLM's failure to complete a compatibility

determination for livestock grazing allotments north of Highway 8 and failure to

complete a management plan, as required by the Sonoran Desert National Monument

proclamation, constitute failures to act under the Administrative Procedure Act Section

706(1); and compel BLM to complete a compatibility determination for these allotments

within six months and approve a final management plan within one year.

B.     Adjudge and declare that the BLM's renewal of ten-year grazing permits

and continuing annual authorizations for allotments north of Highway 8 without

determining that such grazing is compatible with the purposes of the Sonoran Desert

National Monument is arbitrary, capricious, an abuse of discretion, and/or contrary to

law; and reverse and set aside these renewed permits and authorizations.

C.     Grant such preliminary or permanent injunctive relief as requested hereafter

by Plaintiff.

D.     Award Plaintiff its reasonable costs, litigation expenses, and attorneys' fees

associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. §

2412 et seq. and/or all other applicable authorities; and

      E.    Grant such further relief as the Court deems just and proper in order to provide Plaintiff with relief and protect the public interest.

Dated this 21st day of October, 2008

/s/Lauren M. Rule
Lauren M. Rule (ISB # 6863)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)
lrule@advocateswest.org

/s/Erik B. Ryberg
Erik B. Ryberg (AZB # 023809)
445 W. Simpson Street
Tucson, AZ 85701
(520) 622-3333
ryberg@seanet.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of October 2008, I caused a true and correct copy of the foregoing FIRST AMENDED COMPLAINT to be electronically filed with the Clerk of the Court using the CM/ECF System which sent notification of such filing to the following counsel of record in this matter:

Donna S. Fitzgerald
Donna.Fitzgerald@usdoj.gov

Erik B. Ryberg
ryberg@seanet.com

s/Lauren M. Rule
Lauren M. Rule (ISB # 6863)

FIRST AMENDED COMPLAINT - 19