

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

WESTERN WATERSHEDS PROJECT, Plaintiff,

v.

BUREAU OF LAND MANAGEMENT, Defendant.

No. CV 08-1472-PHX-MHM

**ORDER**

Currently before the Court is Defendant Bureau of Land Management's Motion to Dismiss Plaintiff Western Watersheds Project's Amended Complaint for lack of subject matter jurisdiction and failure to state a claim pursuant to Federal Rules of Civil Procedure ("FRCP") 12(b)(1) and 12(b)(6). (Dkt. #25). After reviewing the pleadings and holding oral argument on January 13, 2009, the Court issues the following order.

## I. PROCEDURAL HISTORY

On August 11, 2008, Plaintiff Western Watersheds Project ("WWP") filed a Complaint against Defendant Bureau of Land Management ("BLM"), challenging the BLM's renewal of grazing permits and subsequent annual grazing authorizations under the Sonoran Desert National Monument Proclamation ("Proclamation"), Proclamation No. 7397, 66 Fed. Reg. 7354 (Jan. 22, 2001). (Compl., Dkt. #1, ¶¶ 75-78). WWP also alleges that the BLM has violated the Proclamation by failing to issue (1) a determination as to whether livestock grazing is compatible with the purpose of protecting the natural

and historic resources on the Sonoran Desert National Monument ("Monument"), and (2) a management plan addressing the necessary actions to protect the natural and historic resources on the Monument. (Amend. Compl., Dkt. #9, ¶¶ 71-75).

Six days after filing its Amended Complaint on October 21, 2008 , and prior to any responsive pleading by the BLM, WWP filed a Motion for Summary Judgment and Injunction. (Dkt. #s 10-19). WWP also filed a separate Motion for Permanent Injunction on October 31, 2008. (Dkt. #s 22-23).

On November 4, 2008, the BLM filed a Motion to Dismiss for lack of subject matter jurisdiction and failure to state a claim under FRCP 12(b)(1) and 12(b)(6), and a Motion to Stay briefing on WWP's Motions for Summary Judgment and Permanent Injunction. (Dkt. #s 24-26). The Court held a hearing on November 18, 2008, and granted the Motion to Stay. (Dkt. #30). The Court also directed expedited briefing on the Motion to Dismiss and directed the BLM to compile the Administrative Record. (Id.). In addition, WWP withdrew its Motions for Summary Judgment and Permanent Injunction, which may be re-filed after the Administrative Record is compiled, subject to the Court's ruling on the BLM's jurisdictional challenges in the pending Motion to Dismiss. (Id.).

## II. BACKGROUND

### A. Sonoran Desert National Monument

On January 17, 2001, President William Jefferson Clinton established the Sonoran Desert National Monument by signing Proclamation No. 7397, 66 Fed. Reg. 7354 (Jan. 22, 2001), under the authority of Section 2 of the Antiquities Act of 1906, 16 U.S.C. § 431. (Amend. Compl., Ex. 1 to Rule Decl.). The Monument is located approximately 60 miles southwest of Phoenix, Arizona, and encompasses 496,377 acres of "untrammeled Sonoran desert landscape." (Id., ¶¶ 15-16, 20). The Monument was created to preserve and protect the functioning Sonoran desert ecosystem and diverse array of biological, scientific, and historic resources located within the Monument. (Id., Ex. 1 to Rule Decl.).

Proclamation No. 7397 states that the Secretary of the Interior must manage the Monument through the BLM to implement the purposes of the Proclamation and prepare

a management plan that addresses the actions necessary to protect the objects identified in the Proclamation. 66 Fed. Reg. 7354, 7356. The Proclamation also prohibits the BLM from renewing grazing permits on Federal lands within the Monument south of Interstate Highway 8, and provides that grazing north of Interstate 8 may be continued only to the extent that the BLM determines that it is compatible with the purpose of protecting the objects identified in the Proclamation. Id.

Pursuant to the Proclamation, the BLM has closed most of the grazing allotments within the Monument south of Interstate 8; the remaining allotment is set to close on February 29, 2009. (Amend. Compl., ¶ 34). However, to date, the BLM has not completed a management plan for the Monument or made a determination as to whether grazing within the Monument north of Interstate 8 is compatible with protecting the Monument's natural and historic resources. (Id., ¶¶ 65, 69). In addition, despite failing to create a management plan or issue a grazing compatibility determination, the BLM has renewed grazing permits for five allotments in the northern portion of the Monument, it continues to annually authorize grazing on these allotments, as well as on a sixth allotment whose permit is set to expire on February 28, 2009. (Dkt. #25, p.5, Exs. 1A-E).

**B. 1998-2004 Congressional Appropriations Riders**

In 1997, the Interior Board of Land Appeals held that the BLM must prepare a site-specific environmental analysis prior to authorizing grazing on allotments within Federal lands. National Wildlife Federation v. BLM, 140 IBLA 85 (1997). That ruling, along with a spike in grazing permit expirations (and subsequent changes to the BLM's policies for the renewal of grazing permits), resulted in a backlog of permit renewals. (Dkt. #25-2, p.3). As a result, in 1998 Congress began passing legislation in the form of yearly appropriations riders, directing the BLM to renew all grazing permits set to expire during the following fiscal year, with the same terms and conditions, until the BLM completed processing of the permits in compliance with all applicable laws and regulations. Omnibus Consol. & Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, § 124, 112 Stat. 2681, 2681-261 (1998); Consol. Appropriations

Act, 2000, Pub. L. No. 106-112, § 123, 113 Stat. 1501, 1501A-159-60 (1999); Dep't of the Interior & Related Agencies Appropriations Act, 2001, Pub. L. No. 106-291, § 116, 114 Stat. 922, 943 (2000); Dep't of the Interior & Related Agencies Appropriations Act, 2002, Pub. L. No. 107-63, § 114, 115 Stat. 414, 438-39 (2001); Consol. Appropriations Resol., 2003, Pub. L. No. 108-7, § 328, 117 Stat. 11, 276-77 (2003).

Most recently, on November 10, 2003, Congress passed the Department of the Interior and Related Agencies Appropriations Act, 2004, which likewise directs the BLM to renew all grazing permits set to expire during fiscal years 2004-2008, with the same terms and conditions, until the BLM completes processing of the permits in compliance with all applicable laws and regulations. Pub. L. No. 108-108, § 325, 117 Stat. 1241, 1308 (2004).

## III. LEGAL STANDARD

The BLM moves to dismiss WWP's Amended Complaint for lack of subject matter jurisdiction pursuant to FRCP 12(b)(1), or in the alternative, for failure to state a claim upon which relief may be granted pursuant to FRCP 12(b)(6). (Dkt. #25-2, p.5).

When a party moves to dismiss a complaint for lack of subject matter jurisdiction, that party bears the burden of proof that the court has jurisdiction to decide the claim(s). Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994) ("It is to be presumed that a cause lies outside [the court's] limited jurisdiction, [ ] and the burden of establishing the contrary rests upon the party asserting jurisdiction."); see also Thornhill Publ'n v. General Tel. & Elecs. Corp., 594 F.2d 730, 733 (9th Cir. 1979).

On the other hand, "[t]he motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." Gilligan v. Jamco Development Corp., 108 F.3d 246, 249 (9th Cir. 1997). To survive a motion to dismiss for failure to state a claim, the plaintiff must simply allege facts sufficient "to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007); see also Morley v. Walker, 175 F.3d 756, 759 (9th Cir. 1999) ("A dismissal for failure to state a

claim is appropriate only where it appears, beyond doubt, that the plaintiff can prove no set of facts that would entitle it to relief.”).

In evaluating a motion to dismiss, “all well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the nonmoving party.” Wyler Summit Partnership v. Turner Broad. Sys. Inc., 135 F.3d 658, 661 (9th Cir. 1998). However, “the court [is not] required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.” Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001). Likewise, a formulaic recitation of the elements of a cause of action will not do.” Twombly, 127 S. Ct. at 1965.

Furthermore, a district court need not limit itself to the allegations in the complaint; courts may take into account “facts that are [ ] alleged on the face of the complaint [and] contained in documents attached to the complaint.” Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005). In addition, “a district court [may] consider documents ‘whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff’s] pleading.’” In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir. 2002) (quoting Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994)). Moreover, “[f]or motions to dismiss under Rule 12(b)(1), unlike a motion under Rule 12(b)(6), the moving party may submit affidavits or any other evidence properly before the court . . . . It then becomes necessary for the party opposing the motion to present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction.” Ass’n of Am. Med. Colleges v. United States, 217 F.3d 770, 778-79 (9th Cir. 2000); White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000) (“With a factual Rule 12(b)(1) attack, [ ] a court may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment.”).

## IV. DISCUSSION

### A. The Antiquities Act

The Antiquities Act authorizes the President of the United States:

> in his discretion, to declare by public proclamation historic landmarks . . . and other objects of historic and scientific interest that are situated upon lands owned or controlled by the Government of the United States to be national monuments, and may reserve as a part thereof parcels of land, the limits of which in all cases shall be confined to the smallest area compatible with the proper care and management of the objects to be protected.

16 U.S.C. § 431. Courts are severely limited in their review of such congressionally authorized presidential actions:

> It has long been held that where Congress has authorized a public officer to take some specified legislative action[,] when in his judgment that action is necessary or appropriate to carry out the policy of Congress, the judgment of the officer as to the existence of the facts calling for that action is not subject to review.

United States v. George S. Bush & Co., 310 U.S. 371 (1940) (internal citations omitted). Thus, while courts can evaluate whether the President exercises his discretion in accordance with the standards of the Antiquities Act, courts cannot review the President's determinations and factual findings. See, e.g., Mountain States Legal Found. v. Bush, 306 F.3d 1138 (D.C. Cir. 2002) ("Although the Supreme Court has never expressly discussed the scope of judicial review under the Antiquities Act, . . . . [t]he Court has highlighted the separation of powers concerns that inhere in such circumstances and has cautioned that these concerns bar review for abuse of discretion altogether."); Alaska v. Carter, 462 F.Supp. 1155, 1160 (D. Alaska 1978) ("[T]he President is not subject to the impact statement requirement of [the National Environmental Policy Act] when exercising his power to proclaim national monuments under the Antiquities Act.").

**B. The Administrative Procedures Act**

The Administrative Procedures Act ("APA") provides for judicial review of agency action. See 5 U.S.C. § 702 ("A person suffering legal wrong because of *agency action*, or adversely affected or aggrieved by *agency action* within the meaning of a relevant statute, is entitled to judicial review.") (emphasis added). A court has subject matter jurisdiction to review an agency action under the APA where the claims for relief "identify some [particular] agency action" and "the agency action in question [is a] final agency action." Lujan v. National Wildlife Fed'n., 497 U.S. 871, 882 (1990) (internal

quotations omitted); see 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."). An agency action "includes the whole or a part of any agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

"[A]n agency's action is not necessarily final merely because it is binding." Appalachian Power Co. v. E.P.A., 208 F.3d 1015, 1022 (D.C. Cir. 2000). "As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process, . . . it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (internal citations omitted).

**C. Judicial Review of Presidential Proclamations**

WWP asserts two claims for relief in its Amended Complaint: (1) violation of the Sonoran Desert National Monument Proclamation for failure to complete a compatibility determination and management plan, and (2) violation of the Sonoran Desert National Monument Proclamation for reauthorizing grazing prior to conducting a compatibility determination. (Amend. Compl., ¶¶ 71-79). Both claims are brought under judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The BLM has moved to dismiss WWP's Amended Complaint under FRCP 12(b)(1) for lack of subject matter jurisdiction, asserting that "the APA does not allow for judicial review of Presidential actions." (Dkt. #34, p.7). As such, the initial question before the Court is whether presidential proclamations, or presidential directives therein, issued pursuant to the Antiquities Act are subject to judicial review under the APA.

It is undisputed that the APA does not apply to Presidential action. See Dalton v. Specter, 511 U.S. 462, 469 (1994) ("[T]he President's actions [are] not reviewable under the APA, because the President is not an 'agency' within the meaning of the APA."). However, WWP argues that it is not challenging "action by the President, such as the

monument proclamation itself," but "BLM's failure to complete the mandatory compatibility determination and management plan." (Dkt. #32, pp. 12-13). In other words, WWP seeks judicial review under the APA of BLM's failure to act in accordance with the directions in Proclamation No. 7397, i.e., complete a compatibility determination and management plan.

In Tulare County v. Bush, the plaintiff sought relief under the APA, alleging that the Forest Service's management of the Giant Sequoia National Monument violated both the National Environmental Policy Act ("NEPA") and the National Forest Management Act ("NFMA"). 185 F.Supp.2d 18, 28 (D.D.C. 2001). The district court held that judicial review was unavailable under the APA "because the [agency] is merely carrying out directives of the President, and the APA does not apply to presidential action." 185 F.Supp.2d 18, 28 (D.D.C. 2001). The court went on to state:

> Any argument suggesting that this action is agency action would suggest the absurd notion that all presidential actions must be carried out by the President him or herself in order to receive the deference Congress has chosen to give presidential action. The court refuses to give the term "presidential action" such a confusing and illogical interpretation.

Id. at 28-29. However, on appeal, the D.C. Circuit affirmed the district court's dismissal on the basis of failure to state a claim under FRCP 12(b)(6) rather than lack of subject matter jurisdiction under FRCP 12(b)(1). Tulare County v. Bush, 306 F.3d 1138, 1143 (D.C. Cir. 2002) ("Although Tulare County refers to the existence of foresters on the ground, the complaint does not identify these foresters' acts with sufficient specificity to state a claim."). As for jurisdiction, the D.C. Circuit noted that "Presidential actions, of course, are not subject to APA review," but then indicated that Tulare County might have, had it stated a claim with sufficient specificity, "overcome this bar by challenging the non-presidential actions of the Forest Service, referring to two Forest Service documents – an internal Forest Service memorandum interpreting the Proclamation and an interim plan that directs the day-to-day management of the Monument – allegedly showing that the Service is not acting consistently with the Proclamation." Id.

Regardless, Tulare County is distinguishable; there the plaintiff sought APA review of its claims that the Forest Service's management of the Grand Sequoia National Monument violated NEPA and NFMA. It is uncontested that judicial review of agency action is routinely available under the APA when the underlying statute contain no private rights of action. See, e.g., Chrysler Corp. v. Brown, 441 U.S. 281, 317-19 (1979) (it is not necessary to find a private right of action under a particular statute in order to enforce a federal agency's compliance with that statute under the APA); Native Ecosystems Council v. U.S. Forest Service, 428 F.3d 1233, 1238 (9th Cir. 2005) ("Because NFMA and NEPA do not provide a private cause of action to enforce their provisions, agency decisions allegedly violating NFMA and NEPA are reviewed under the Administrative Procedure Act."); Oregon Natural Resources Council Fund v. Brong, 492 F.3d 1120, 1124 (9th Cir. 2007) (noting that decisions that allegedly violate the Federal Land Policy and Management Act are reviewed under the APA). In contrast, here WWP seeks APA review of its claims that the BLM's failure to issue a grazing compatibility determination or create a management plan for the Sonoran Desert National Monument violates the monument proclamation itself. In other words, WWP seeks to enforce the presidential directions in Proclamation No. 7397 under the APA, as opposed to merely ensuring that agency action is taken in accordance with the agency's statutory obligations. So the question remains as to whether agency action (or failure to act) taken pursuant to directions within a presidential proclamation is subject to judicial review under the APA.

In support of its position that Proclamation No. 7397 is subject to judicial review under the APA, WWP analogizes proclamations with executive orders and cites the Court to Ninth Circuit authority holding that parties may challenge final agency actions under the APA that allegedly violate executive orders. In City of Carmel-By-The-Sea v. U.S. Dept. of Transp., the Ninth Circuit held that "[u]nder certain circumstances, Executive Orders, with specific statutory foundation, are treated as agency action and reviewed under the Administrative Procedure Act." 123 F.3d 1142, 1166 (9th Cir. 1997). The

Ninth Circuit went on to define those "certain circumstances" to refer to executive orders that set objective standards and do not preclude judicial review. See id. ("The Executive Orders here do not preclude judicial review and there is 'law to apply,' as these Executive Orders set objective standards.").

It is undisputed that "[p]residential proclamations and [executive] orders have the force and effect of laws when issued pursuant to a statutory mandate or delegation of authority from Congress." Independent Meat Packers Associations v. Butz, 526 F.2d 228, 234 (8th Cir. 1975) (citations omitted); see, e.g., City of Albuquerque v. U.S. Dept. Of Interior, 379 F.3d 901, 913 ("If an executive order has a specific statutory foundation it is given the effect of a congressional statute."). Therefore, to the extent that a presidential proclamation is issued pursuant to the Antiquities Act, the proclamation must be given "the force and effect of a statute." See City of Albuquerque, 379 F.3d at 915; Farkas v. Texas Instrument, Inc., 375 F.2d 629, 632 (5th Cir. 1967). It is well-settled law that judicial review is available under the Antiquities Act to challenge a proclamation to ensure that the President complied with the Act and did not exceed his statutory authority when designating certain lands as a national monument. See, e.g., Mountain States Legal Foundation v. Bush, 306 F.3d 1132, 1136 (D.C. Cir. 2002).

However, the fact that a proclamation is issued pursuant to the Antiquities Act does not necessarily mean that judicial review is available under the APA to challenge directions contained within that proclamation. But see City of Albuquerque, 379 F.3d at 915 ("Since we give the Executive Order the force and effect of a statute, it can provide the basis for standing under the Administrative Procedure Act."). Although the Antiquities Act provides the statutory authority for the President to issue a proclamation, the Act does not similarly provide for the "specific statutory foundation" to subject agency action mandated by directions contained within that proclamation to judicial review under the Administrative Procedure Act. The Antiquities Act merely authorizes the President "to create a national monument and reserve land for its use simply by issuing a proclamation with respect to land owned or controlled by the Government of the

United States." U.S. v. California, 436 U.S. 32, 40 (1978) (quotation marks omitted). The Act also requires that the "parcels of land" reserved "be confined to the smallest area compatible with the proper care and management of the objects to be protected." 16 U.S.C. § 431. As such, Congress' delegation of authority to the President under the Antiquities Act relates only to the establishment of national monuments; but it does not amount to a statutory mandate or delegation of authority from Congress to the President for the purpose of managing the monuments established under the Act. "A reservation under the Antiquities Act thus means no more than that the land is shifted from one federal use, and perhaps from one federal managing agency, to another." California, 436 U.S. at 41. Proclamation No. 7397's directions to the BLM concerning the creation of a management plan and issuance of a grazing compatibility determination are not sufficiently related to the Act to be a valid exercise of the Act's delegated authority. Accordingly, the Antiquities Act cannot provide the basis for standing under the APA to the extent that WWP seeks review of action agency (or failure to act) in accordance with the directions contained within the Proclamation.[1]

The Court notes that had Proclamation No. 7397 been issued pursuant to the Antiquities Act and a further "specific statutory foundation" authorizing agency action, such as NEPA and/or the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. § 1701, *et seq.*, which governs the ways public lands administered by the BLM are managed, agency action allegedly taken in violation of the Proclamation (and its directions concerning a management plan and grazing compatibility determination) would have been subject to judicial review under the Administrative Procedure Act. Such a

---

[1]Contrary to counsel's assertion at oral argument, California ex rel. Lockyer v. U.S. Forest Service, 465 F.Supp.2d 917 (N.D. Cal. 2006), does not stand for the proposition that review of agency action taken pursuant to a presidential proclamation is available under the APA. In that case, although the plaintiff brought a claim under the APA that the Forest Service failed to comply with directions contained within a monument proclamation, the district court explicitly declined to decide whether such a claim was subject to review under the APA. Id. at 923, n. 2 ("[T]he Court will address these arguments only under NEPA.").

finding adheres to the Ninth Circuit authority defining the circumstances under which agency actions that allegedly violate Executive Orders are subject to judicial review under the APA.

For instance, in City of Carmel-By-The-Sea, the Ninth Circuit held that Executive Orders 11990 and 11988 were subject to judicial review under the APA; both orders were explicitly issued in furtherance of, among other statutes, NEPA. 123 F.3d at 1166-67. NEPA and the other listed statutes provided the "specific statutory foundation" for the directions contained in the Executive Orders. In addition, in City of Albuquerque and Farkas, the statutory foundation was the Federal Property and Administrative Services Act of 1949. City of Albuquerque, 379 F.3d at 914-15; Farkas, 375 F.2d at 632. Moreover, in Butz, the Eighth Circuit found that Executive Order No. 11821 was not subject to judicial review because it "cite[d] no specific source of authority other than the 'Constitution and laws of the United States,'" and thus "was intended primarily as a managerial tool for implementing the President's personal economic policies and not as a legal framework enforceable by private civil action." 526 F.2d at 235-36. Likewise, in Cappaert v. Untied States, although the Supreme Court enforced the management directions contained in the Proclamation establishing the Devil's Hole Monument, the Proclamation was explicitly issued in furtherance of the National Park Service Act, 16 U.S.C. §§ 1-3, which provided the specific statutory foundation/authority of the Director of the Park Service to manage the lands of the Monument. 426 U.S. 128, 140-41 (1976). Proclamation No. 7397, on the other hand, references no specific statutory foundation for issuing the directions concerning the creation of a management plan or issuance of a grazing compatibility determination. Therefore, the Court finds that the BLM's failure to complete a management plan or issue a grazing compatibility determination is not subject to judicial review under the Administrative Procedure Act.[2]

---

[2]Although counsel for BLM stated at oral argument that BLM only asserts that WWP's *first* claim for relief is not subject to judicial review under the APA, it is unclear how

**D. Section 325 & the Renewal of Grazing Permits**

Even if Proclamation No. 7397 was subject to judicial review under the Administrative Procedure Act, Section 325 of the Department of the Interior and Related Agencies Appropriations Act of 2004 bars WWP's claims relating to the grazing compatibility determination and BLM's renewal of grazing permits on the Sonoran Desert National Monument.

Section 325 requires the BLM to renew under FLPMA all grazing permits and leases set to expire during fiscal years 2004-2008 until such time as the BLM is able to fully process the permits in compliance with "all applicable laws and regulations." Pub. L. No. 108-108, 117 Stat. 1241, § 325 (Nov. 10, 2003). Section 325 also leaves to the Secretary the "sole discretion [to] determine the priority and timing for completing [the] required environmental analysis of grazing allotments based on the environmental significance of the allotments and funding available to the [BLM] for this purpose." Id.

First, WWP contends that the language in Section 325 concerning "all applicable laws and regulations" and "required environmental analysis" refers only to "procedural laws such as NEPA." (Dkt. #32, p.8). Second, WWP points to the fact that Section 325 requires that grazing permits are to be renewed under Section 402 of FLPMA, 43 U.S.C. § 1752, which in turn states that permits issued for livestock grazing on public lands must be "consistent with the governing law," and that "[n]othing in [Section 325] shall be deemed to alter the statutory authority of the Secretary of the Interior . . ." Pub. L. No. 108-108, 117 Stat. 1241, § 325. Furthermore, WWP argues that "[h]ad Congress

---

that finding does not also apply to WWP's second claim for relief. WWP's second claim seeks review under Section 706(2) of the APA of BLM's renewal of grazing permits on the Monument prior to completing a grazing compatibility determination as mandated by the Proclamation. If the BLM's failure to complete a compatibility determination is not subject to judicial review under the APA, then it would appear that the BLM's alleged violation of the Proclamation by not completing a compatibility determination prior to renewing grazing permits is also not subject to judicial review under the APA. Nonetheless, the Court will now turn to the BLM's argument that Section 325 of the Department of the Interior and Related Agencies Appropriations Act of 2004 bars WWP's second claim for relief.

intended to repeal or suspend all environmental laws, it easily could have done so – such as by including the phrase 'notwithstanding any other provision of law' as it did in other sections of the 2004 Interior appropriations bill, but not in Section 325." (Dkt. #32, p.6).

However, WWP's interpretation of Section 325 cannot be squared with its text. Although "[r]epeals (or suspension) of legislation by implication are disfavored, especially 'when the claimed repeal rests solely on an Appropriations Act,'" Forest Guardians v. Babbitt, 174 F.3d 1178, 1192 (10th Cir. 1999) (quoting Tennessee Valley Authority v. Hill, 437 U.S. 153, 190 (1978)), in enacting Section 325 "Congress unequivocally required the Secretary of the Interior to renew any expired, transferred or . . . waived grazing permit whatever the Secretary's progress in 'processing . . . such permit . . . in compliance with all applicable laws and regulations.'" Great Old Broads For Wilderness v. Kempthorne, 452 F.Supp.2d 71, 80-81 (D.D.C. 2006) (quoting Pub. L. No. 106-113, §123, 113 Stat. at 1501A-159). In Oregon Natural Desert Association v. United States Forest Service, the district court held that "[t]he NEPA requirement for re-issuing a grazing permit has been held in abeyance by Congress with instruction to federal agencies to work on reducing the backlog of NEPA analysis." 2005 WL 1334459, at 12 (D. Or. 2005) ("ONDA I"). A subsequent ruling from the District of Oregon affirmed that holding, similarly stating that under Section 325, "Congress provided for continued grazing on permitted federal allotments under otherwise invalid grazing permits by withholding the need for the requisite NEPA analysis upon the re-issuance of a grazing permit." Oregon Natural Desert Association v. United States Forest Service, 2005 WL 1459328, at 9 (D. Or. 2005) ("ONDA II"). As such, WWP asserts that Section 325 only tolls requirements under NEPA and other procedural laws. But the ONDA cases do not support that assertion; nothing in those cases restricts the tolling language in Section 325 and other similar appropriations riders concerning "all applicable laws and regulations" and "required environmental analysis" to only "procedural laws such as NEPA."

In addition, Forest Guardians v. Veneman does not support WWP's interpretation and application of Section 325. 305 F.Supp.2d 1118 (D. Ariz. 2003). In Forest

Guardians, the district court held that despite the requirement in Section 504 of the Rescissions Act of 1995 that "[n]otwithstanding any other law" grazing permits must be renewed despite failure to complete the required analysis under "NEPA and other applicable laws," Section 504 did not constitute a broad exemption from all environmental laws that might on their own require modification of the permits. 305 F.Supp.2d at 1121 (quoting Recessions Act § 504, Pub. L. No. 104-19, 109 Stat. 194, 212 (July 27, 1995)). The district court also held that "[t]he Recessions Act did not suspend Defendant's duty to comply with the ESA . . ." Id. In other words, Forest Guardians held that Section 504 neither exempted nor suspended the Forest Service's duty to comply with relevant environmental laws. Instead, "[t]he Recessions Act only provides a limited grace period of validity for grazing permits that expire and must be renewed prior to the relevant environmental (NEPA or ESA) analysis being completed." Id. at 1122.

Similarly, here, Section 325 does not constitute a broad exemption from all environmental laws that might on their own require modification of grazing permits. Neither does Section 325 completely suspend the BLM's duty to comply with directions in Proclamation No. 7397 to issue a grazing compatibility determination. Like Forest Guardians, Section 325 merely provides a limited grace period of validity for grazing permits that expire and must be renewed prior to the relevant environmental analysis, such as the compatibility determination, being completed.[3] This temporary tolling is confirmed by the fact that Section 325 specifically states that permits "may be canceled, suspended or modified . . . to meet the requirements of such applicable laws and regulations" once the processing of the permits is complete. Pub. L. No. 108-108, 117 Stat. 1241, § 325. In essence, Section 325 changes the relevant environmental analysis

---

[3]Under Section 325, the "limited grace period" is fiscal years 2004-2008. Pub. L. No. 108-108, 117 Stat. 1241, § 325. However, the Court recognizes WWP's frustration that that "limited" period has been consistently extended by Congress through other appropriations riders since the Monument's inception in 2001.

that applies to grazing permits from a condition precedent into a condition subsequent; the analysis still has to occur, but for the time being, not prior to renewal of the permits.

On the other hand, in Western Watersheds Project v. Bennett, the district court held that riders such as Section 325 do not "divest [the] Court of jurisdiction to apply FLPMA" because the renewals are to be made pursuant to FLPMA, which in turn states that renewals must be "consistent with the governing law." 2008 WL 2003114, at 7 (D. Idaho 2008). However, the district court based its holding on an earlier finding with respect to Section 142 of the 2004 Interior appropriations bill, stating that "[b]oth riders contain identical language that renewals are issued pursuant to 'Section 402 of [FLPMA] and section 3 of the Taylor Grazing Act . . .'" Western Watersheds, 2008 WL 2003114, at 7. But Section 142 is not identical to Section 325. In fact, although Sections 142 and 325 contain some similar language, not only does Section 325 not mention the Taylor Grazing Act of 1934, but Section 142 does not contain similar language concerning the tolling of "all applicable laws and regulations" with respect to the renewal of grazing permits on Federal lands. Further, if the Court accepted WWP's argument, and the District of Idaho holding, then Section of 325 would present the BLM with "the choice of (1) acting unlawfully by renewing the relevant permits and thereby violating [the Proclamation]; or (2) acting unlawfully by delaying renewal of the relevant permits to allow compliance with [the Proclamation], and thereby violating [Section 325]." Great Old Broads, 452 F.Supp.2d at 81. As the district court stated in Great Old Broads, however, "[t]his makes no sense. Through the enactment of the riders, Congress amended 'all applicable laws' to require reissuance of expired, transferred or waived grazing permits prior to the completion of otherwise required actions." Id. Thus, even if agency action (or failure to act) taken pursuant to Proclamation No. 7397 was subject to review under the APA, Section 325 bars WWP's claims relating to the BLM's renewal and processing of grazing permits on the Sonoran Desert National Monument.

Nonetheless, WWP also argues that Section 325 does not apply to its claim of unreasonable delay and/or unlawful withholding of the grazing compatibility

determination and management plan because Section 325 applies only to the processing of grazing permits, and the compatibility determination and management plan "do not equate to the routine processing of individual grazing permits contemplated by the rider." (Dkt. #32, p.9). Clearly, however, if the compatibility determination is a precondition to processing of grazing permits (and a negative finding could presumably prohibit the renewal of such permits), then the compatibility determination relates to Section 325's requirement that the BLM reissue all expired, transferred or waived grazing permits prior to the completion of processing the permits in accordance with "all applicable laws and regulations" and the "required environmental analysis".

On the other hand, the Proclamation No. 7397's directions concerning the management plan only require the BLM to address "the actions, including road closures or travel restrictions, necessary to protect the objects identified in [the] proclamation." Proclamation No. 7397, 66 Fed. Reg. 7354, 7356. Thus, if the Proclamation was subject to judicial review under the APA, Section 325 would likely not bar review of the BLM's failure to complete a management plan to the extent that the plan does not relate to the BLM's renewal of grazing permits or the grazing compatibility determination.[4] As the Proclamation's direction are, however, not subject to judicial review under the APA, this finding is irrelevant.[5]

Finally, WWP argues that "because the rider only addresses renewal of grazing permits, WWP's challenges to BLM's annual authorizations are obviously not barred by

---

[4]However, as the BLM points out, WWP's Complaint only alleges that the "BLM has made no changes in grazing management on the monument allotments north of Highway 8 despite studies and data showing that grazing is impairing monument resources." (Amend. Compl., ¶ 52). As such, "plaintiff's only complaint is how the lack of a management plan has affected grazing under the renewed permits," and thus it appears that "plaintiff has linked the completion of the management plan specifically to the continued grazing under the renewed permits." (Dkt. #34, p.6).

[5]FLPMA also requires the BLM to prepare a land use management plan that considers grazing compatibility, but WWP asserts no claim for judicial review of any FLPMA compliance. (Dkt. #25-2, p.13).

the rider. Those annual grazing authorizations are final agency actions that can be challenged independent of the permit renewals." (Dkt. #32, p.11). It is uncontested that an annual grazing authorization is a final agency action. See Oregon Natural Desert Association v. United States Forest Service, 465 F.3d 977, 986 (9th Cir. 2006) ("[A]n [annual operating instruction] is a final agency action subject to judicial review under § 706(2)(A) of the APA."). An annual grazing authorization is "the consummation of a process that sets the parameters for the upcoming grazing season and [ ] imposes legal consequences on the permit holder." Id. at 983.

However, annual authorizations are also an integral part of the grazing permit process, as such authorizations are "responsive to conditions that the Forest Service could not or may not have anticipated and planned for in the [ ] grazing permit, such as drought conditions, timing and duration of rainfall over the grazing season, success or failure of habitat restoration projects, water quality, or degree of risk to threatened or endangered species affected by grazing." Id. at 980-81. As such, BLM argues that "[i]n applying Section 325, it would make no sense to allow BLM to renew permits before completing required analyses, but then subject annual authorizations to injunctions. Such an application would subvert the purpose of Section 325." (Dkt. #34, p.11). In addition, the Court notes that Section 325's delegation to the Secretary the "sole discretion" to "determine the priority and timing for completing required environmental analysis of grazing allotments," would seem to apply as equally to annual authorizations as it does to the renewal of grazing permits. Pub. L. No. 108-108, § 325. In any event, as WWP's claims for relief based on the BLM's alleged violations of Proclamation No. 7397 are not subject to judicial review, as discussed above, the Court need not at this time address whether Section 325 applies equally to both grazing permits and annual authorizations.

**Accordingly,**

**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss (Dkt. #25) is GRANTED.

**IT IS FURTHER ORDERED** directing the Clerk of the Court enter judgment accordingly.

DATED this 2nd day of February, 2009.

Mary H. Murguia
United States District Judge