John D. Leshy (DC Bar No. 923391)
University of California, Hastings College of the Law
200 McAllister Street
San Francisco, CA  94102
Tel:  (415) 565-4726
Fax: (415) 565-4865
leshyj@uchastings.edu

James S. Angell (CO Bar No. 31880), *pro hac vice* pending
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO  80202
Tel:  (303) 623-9466
Fax: (303) 623-8083
jangell@earthjustice.org

Attorneys for Amici Curiae Natural Resource
Law Professors and Practitioners

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, | ) |
| Plaintiff, | ) Case No. CV 08-1472-PHX-MHM |
| | ) |
| vs. | ) BRIEF OF AMICUS CURIAE |
| | ) NATURAL RESOURCE LAW |
| | ) PROFESSORS AND |
| BUREAU OF LAND MANAGEMENT, | ) PRACTITIONERS IN SUPPORT |
| | ) OF MOTION FOR |
| Defendant. | ) RECONSIDERATION |
| | ) |

**INTRODUCTION**

On February 2, 2009, this Court entered an Order dismissing Western Watersheds Project's (WWP) challenge to the Bureau of Land Management's failure to comply with the management dictates of the presidential proclamation that created the Sonoran Desert National Monument.  The principal ground for this Order was that the Antiquities Act of 1906, the source of the President's power to create national monuments, did not give the President authority to impose the management restrictions on the use of the federal land within the monument that WWP sought to enforce.

Amici, who are natural resources law professors and practitioners who have taught, published, and/or practiced extensively in the field (see Exhibit 1), believe this ruling was in error.[1]

**ARGUMENT**

**I.    THE ANTIQUITIES ACT VESTS THE PRESIDENT WITH BROAD AUTHORITY TO PROTECT OBJECTS OF HISTORIC OR SCIENTIFIC INTEREST ON FEDERAL LANDS, AND THE COURTS HAVE WITHOUT EXCEPTION SUSTAINED EXERCISES OF THIS POWER.**

The original impetus for what became the Antiquities Act of 1906, 16 U.S.C. §§ 431-433, was widespread public dismay at a wave of plunder and destruction of newly-discovered archaeological sites in the Southwest at the turn of the twentieth century. Albert C. Lin, Clinton's National Monuments: A Democrat's Undemocratic Acts?, 29 Ecology L.Q. 707, 713 (2002).  From the beginning, advocates for protection inside and outside the government sought more expansive preservation authority.  Mark Squillace, The Monumental Legacy of the Antiquities Act of 1906, 37 Ga. L. Rev. 473, 477-486 (2003).  Congress responded by delegating to the President authority to "reserve" federal

[1]  Amici limit their argument to the Antiquities Act and do not address Section 325 of the 2004 Interior Appropriations Act.

land for the protection not only of "historic landmarks, historic and prehistoric structures," but also "other objects of historic or scientific interest."  16 U.S.C. § 431; Squillace, at 484-85; Richard M. Johannsen, <u>Public Land Withdrawal Policy and the Antiquities Act</u>, 56 Wash. L. Rev. 439, 450 (1981).

From the outset, presidents used the Antiquities Act to protect a wide variety of objects of historic or scientific interest covering large areas of federal land.  Theodore Roosevelt, who signed the Antiquities Act into law, used it almost immediately to protect the Devil's Tower in Wyoming, and followed that with seventeen other proclamations, including ones protecting 600,000 acres around Mount Olympus in Washington and 800,000 acres of the Grand Canyon.  <u>See</u> Squillace, at 585-610 (listing monument proclamations). Over the years, presidents from both parties have invoked the Antiquities Act more than one hundred times to protect some of the nation's most iconic landscapes – including the Grand Tetons, Death Valley, and the lands in Southwest Utah that would become Zion National Park.  Besides the Grand Canyon, numerous federal lands in Arizona have been protected by presidents under the Antiquities Act, including Montezuma Castle, Petrified Forest, Tonto, Tumacacori, Navajo, Saguaro, Casa Grande, Chiricahua, Pipe Springs, Wupatki, Sunset Crater, Organ Pipe Cactus, and Tuzigoot National Monuments.  <u>Id</u>.

The President's ability to protect large natural landscapes under the Antiquities Act has been the subject of numerous judicial challenges, and the courts have rejected every one, often in emphatic terms.  <u>See</u> <u>Cappaert v. United States</u>, 426 U.S. 128, 141-42 (1976) (rejecting plaintiff's claim that the President may use the Antiquities Act "only to protect archaeological resources"); <u>Cameron v. United States</u>, 252 U.S. 450, 455-56 (1920) (upholding creation of Grand Canyon National Monument); <u>Mountain States Legal</u>

Foundation v. Bush, 306 F.3d 1132, 1136-37 (D.C. Cir. 2002) (rejecting challenge to six National Monuments); Tulare County v. Bush, 306 F.3d 1138, 1144 (D.C. Cir. 2002) (upholding creation of Giant Sequoia National Monument); Wyoming v. Franke, 58 F. Supp. 890, 895 (D. Wyo. 1945) (upholding creation of Jackson Hole National Monument). See also United States v. California, 436 U.S. 32, 36 (1978) (whether federal lands are included within a National Monument raises "a question only of Presidential intent, not of Presidential power").

II.    **THE ANTIQUITIES ACT DELEGATES TO THE PRESIDENT NOT ONLY THE AUTHORITY TO PROCLAIM NATIONAL MONUMENTS, BUT ALSO THE POWER TO DIRECT HOW MONUMENT LANDS SHALL BE MANAGED IN ORDER TO PROTECT "OBJECTS OF HISTORIC OR SCIENTIFIC INTEREST."**

As noted above, the entire purpose and thrust of the Antiquities Act is to empower the President to protect "objects of historic or scientific interest" found on "lands owned or controlled by the Government of the United States." 16 U.S.C. § 431.  Fairly read, the very power to "declare by public proclamation" that such objects are "national monuments" which are "to be protected" carries with it the power to specify, in the proclamation, management directives the President determines are needed to provide such protection. This is underscored by the Act's contemplation that the executive branch shall give "proper care and management of the objects to be protected."  Id.  It makes no sense to read a statute whose very purpose is to authorize the President to protect important resources found on federal lands as denying the President the authority to prescribe steps to provide that protection.

This Court's narrow reading of the Antiquities Act also is incompatible with the broad delegation to "reserve" federal lands for the statute's protective purpose.  At the time

of its enactment, "reserve" had a distinctive meaning in public land law.  See David A.

Getches, Managing the Public Lands: The Authority of the Executive to Withdraw Lands,

22 Nat. Resources J. 279, 285 (1982) (explaining that in the late nineteenth and early

twentieth centuries, "Congress and the executive responded to growing concerns for the

protection of the remaining public domain by making massive 'withdrawals' of public

lands – preventing certain uses on them – and by establishing 'reservations' – dedicating

lands to particular uses"); C. Wheatley, Study of Withdrawals and Reservations of Public

Lands, A-1 to A-2 (1969) (same).  By giving the President the power to "reserve" tracts of

federal land and thus dedicate it to particular uses, the Act authorized the President to

determine how federal lands in national monuments should be used and managed.[2]

For all these reasons, the conclusion in the February 2 Order that the Antiquities Act

does not provide a "specific statutory foundation" for the President's imposition of

management restrictions is in error.  The Antiquities Act provides a clear foundation for the

President's actions in this case, just as it did for scores of similar monument proclamations

in the past.[3]

---

[2] The few limits the Act puts on the President's protective power – namely, to protect only "objects of historic or scientific interest," and to limit monuments to the "smallest area compatible with the proper care and management of the objects to be protected," 16 U.S.C. § 431, contain no hint of limitations on the President's power to specify the management actions necessary to provide "proper care and management of" these "objects."

[3] The Court's February 2 Order incorrectly says that President Truman's Proclamation of the Devil's Hole National Monument, which was upheld by the U.S. Supreme Court in Cappaert v. United States, 426 U.S. 128 (1976), "was explicitly issued in furtherance of the National Park Service Act, 16 U.S.C. §§ 1-3." Order at 12.  In fact, the Devil's Hole Proclamation merely referenced, in the body of the Proclamation, the national park management statutes as generally governing monument management, in exactly the same way that the Sonoran Desert Proclamation explicitly referenced "applicable legal authorities" and the "[l]aws, regulations and policies followed by the Bureau of Land Management in issuing and administering grazing permits or leases" as generally

Nor can it be plausibly maintained that the President lacks the power to impose land management restrictions in national monument proclamations because the Antiquities Act fails to authorize him to do so in specific terms.  In his influential and oft-cited concurring opinion in the famous Steel Seizure case, Justice Jackson noted that "[w]hen the President acts pursuant to an express or implied authorization of

Congress, his authority is at its maximum." Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635 (1952) (Jackson J., concurring).  Presidential action "pursuant to an Act of Congress would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it."  Id. at 637.

Any suggestion that the statutory authorization in the Antiquities Act needed to specifically mention land management restrictions also flies in the face of City of Albuquerque v. U.S. Dep't of Interior, 379 U.S. 901, 913 (10th Cir. 2004), which the Court's Order cites at 10.  The 10th Circuit rejected just such an extreme specificity requirement in that case because Congress had chosen to provide a broad delegation that, like the Antiquities Act, provides an "'intelligible principle' to guide the exercise of its power." Id. at 914-15.  See also Mountain States Legal Found., 306 F.3d at 1137 (concluding that the Antiquities Act "includes intelligible principles to guide the President's actions").

Given the Act's protective thrust, and its broad delegation of authority to the President, it is not surprising that from the beginning presidents restricted how monument

_____

governing monument management.  Cf. 66 Stat. c18 (1952) with 66 Fed. Reg. 7356 (2001). Moreover, the vast majority of National Monument proclamations cite only the Antiquities Act as authority for their promulgation.

lands would be managed and used.  For example, every one of Theodore Roosevelt's National Monument proclamations provided that unauthorized persons could not "locate or settle upon" monument lands.  See, e.g., Proclamation No. 658, 34 Stat. 3236 (1906) (Devil's Tower Proclamation).

In the ensuing years, a wide variety of restrictions have become commonplace in monument proclamations.  See, e.g., Proclamation No. 1313, 39 Stat. 1752 (1915) (President Wilson prohibited coal and phosphate mining within Colorado's Dinosaur National Monument); Proclamation No. 1608, 42 Stat. 2249 (1921) (President Harding prohibited the cutting of trees within an addition to the Muir Woods National Monument); Proclamation No. 1664, 43 Stat. 1913 (1923) (in creating Pipe Springs National Monument, President Harding directed the Secretary of the Interior to adopt regulations governing the use of the spring for irrigation and stock watering by Indians of the Kaibab Reservation); Proclamation No. 2246, 50 Stat. 1856 (1937) (in creating Capitol Reef National Monument in Utah, President Franklin Roosevelt directed that livestock be allowed to move across the area along specified driveways in accordance with regulations to be adopted by the Secretary of Interior); Proclamation No. 3467, 76 Stat. 1465 (1962) (in enlarging the Gila Cliff Dwellings National Monument, President Kennedy transferred management jurisdiction from the Forest Service to the Department of the Interior, and declared that a corridor of the reserved lands could be used by the Forest Service for particular uses and that the public's use of the corridor would be subject to the management discretion of the Secretary of Agriculture); Proclamation No. 4619, 93 Stat. 1460 (1978) (in enlarging Alaska's Katmai National Monument, President Carter directed the Secretary of the Interior to promulgate regulations concerning subsistence use of the area, and to close

areas to subsistence use under certain circumstances); Proclamation No. 7295, 3 C.F.R. 60 (2001) (in creating Giant Sequoia National Monument, President Clinton directed that motorized vehicle use be allowed only on roads and trails designated in a travel plan to be adopted by the Secretary of Interior); Proclamation 8031, 71 Fed. Reg. 36443, 36444 (2006), as amended by 72 Fed. Reg. 10031 (2007) (in creating the Papahanaumokuakea Marine National Monument, Hawaii, President George W. Bush included a variety of management prescriptions, including prohibiting anyone from "entering the monument except pursuant to permission granted by the Secretaries or their designees").  <u>See also generally</u> Squillace, at 544-49; Carol Hardy Vincent, <u>National Monument Issues, Congressional Research Service Report RS</u> 20902, p. 3 (2006) available at http://www.ncseonline.org/NLE/CRSreports/06Mar/RS20902.pdf (discussing how national monument proclamations may restrict grazing, hunting, and off-road vehicle use).

As the foregoing demonstrates, a century of practice is in complete opposition to the view expressed in this Court's Order that the Antiquities Act "merely" authorizes the President to create national monuments, and does not authorize the President to direct how the monuments shall be managed.  Order at 10-13.  Plainly, President Clinton broke no new ground when he created the Sonoran Desert National Monument and directed the Secretary of the Interior to prepare a management plan and grazing compatibility study, and to forego renewing expiring grazing permits until the compatibility study was complete.  Proclamation No. 7397, 66 Fed. Reg. 7354, 7356 (Jan. 22, 2001).

The President's power to impose management directives in Monument proclamations has never been questioned by Congress or by any other court.  To be sure, presidential exercise of Antiquities Act authority has sometimes stirred controversy and

complaints from members of Congress.  <u>See</u> Squillace, at 489-514.  Bills have even been

introduced from time to time in Congress to repeal or modify the Antiquities Act.  <u>Id</u>. at

568-70.  In response to one such controversy, Congress amended the Antiquities Act to put

federal lands in the State of Wyoming beyond its reach.  <u>See</u> 43 U.S.C. § 431a; Squillace,

at 498.  But Congress has <u>never</u> questioned the President's application of the Act to direct

how federal lands in National Monuments shall be managed.  In fact, although Congress

repealed no fewer than twenty-nine separate federal laws authorizing the President to

withdraw public lands for various purposes in 1976 when it enacted the Federal Land

Policy and Management Act (FLPMA), it left the President's Antiquities Act authority

intact.  <u>See</u> Lin, at 710-11 (citing Pub. L. No. 94-579, sec. 704, 90 Stat. 2743, 2792)

(1976)).  Moreover, Congress specifically directed the Secretary of the Interior not to

"modify or revoke any [Antiquities Act] withdrawal creating national monuments."  43

U.S.C. § 1714(j).[4]

        These congressional actions and non-actions in the face of an open and notorious

executive interpretation and practice "constitute[] persuasive evidence that that

interpretation is the one intended by Congress."  <u>Zemel v. Rusk</u>, 381 U.S. 1, 11 (1965).  In

a major case upholding presidential power to take action to protect federal lands, the

Supreme Court explained that while the President cannot "by his course of action create a

_____

[4]  The President's power has likewise never been questioned by academic commentators,
who have uniformly recognized the President's broad authority to impose management
direction of precisely the sort WWP seeks to enforce in this litigation.  <u>See</u> Lin, at 712
("The president designating the monument has the discretion to delineate permissible uses
within that monument," limited only by the requirement that the uses comport with the
Antiquities Act requirement that the "proper care and management of the objects be
protected") (quoting 16 U.S.C. § 431); Squillace, at 517 (land management restrictions
"can be imposed in the proclamation itself"); Roberto Iraola, <u>Proclamations, National
Monuments, and the Scope of Judicial Review Under the Antiquities Act of 1906</u>, 29 Wm.
& Mary Envtl. L. & Pol'y Rev. 159, 168-69 (2004) ("The President has the discretion to
identify land uses in a national monument").

power[,]… long-continued practice, known to and acquiesced in by Congress, would raise a presumption that the [action] had been [taken] in pursuance of its consent …." <u>United States v. Midwest Oil Co.</u>, 236 U.S. 459, 474 (1915); <u>see also</u> <u>Dames & Moore v. Regan</u>, 453 U.S. 654, 686 (1981); <u>AFL-CIO v. Kahn</u>, 618 F.2d 784, 790 (D.C. Cir. 1979) ("the President's view of his own authority under a statute is not controlling, but when that view has been acted upon over a substantial period of time without eliciting Congressional reversal, it is entitled to great respect") (internal quotation omitted).  This is, in other words, a paradigmatic example of congressional acquiescence.  <u>See</u> <u>Holy Cross Hospital-Mission Hills v. Heckler</u>, 749 F.2d 1340, 1345 (9th Cir. 1984) (finding congressional acquiescence in executive action when Congress subsequently amended the underlying statute, though not in a way that conflicted with the executive action).

   While the Supreme Court has not yet definitively resolved the level of deference due a President's view of the scope of authority delegated to him by statute, lower courts have almost uniformly granted a substantial degree of deference.  <u>See</u> Kevin M. Stack, <u>The Statutory President</u>, 90 Iowa L. Rev. 539, 563-568 (2005) (citing cases).  This has been the case in Antiquities Act litigation.  <u>See</u> <u>Mountain States Legal Foundation</u>, 306 F. 3d 1132; <u>Tulare County v. Bush</u>, 306 F.3d 1138 (D.C. Cir. 2002), <u>cert. denied</u>, 540 U.S. 813 (2003).  One commentator has argued persuasively that something akin to the so-called <u>Chevron</u> deference accorded agency interpretations of their statutory authority should be accorded to presidential interpretations as well.  Stack, at 585-601 (discussing <u>Chevron USA v. Natural Resources Defense Council</u>, 467 U.S. 837 (1984)).  This Court need not address that question because no matter what deference is accorded the President's view of the Antiquities Act, the Act's purpose, text, and construction, in tandem with Congress's more

than century-long acquiescence in its application, demonstrate that the President is authorized by the Act to impose management provisions like those at issue in this case. This Court erred by concluding otherwise.

It bears emphasis that the President's management directives in the Sonoran Desert National Monument proclamation did not contradict any congressional directive regarding the federal lands in question.  Instead, the President was merely channeling the exercise of discretion that Congress had given federal land managers under existing federal statutes, particularly the Taylor Grazing Act and the Federal Land Policy and Management Act, which give federal land managers broad authority over livestock grazing and land management planning generally on federal lands.[5]

Because the President here was merely directing the federal land manager to exercise his or her discretion under existing law in a specific way, this case is distinguishable from United States v. California, 436 U.S. 32 (1978), which was cited in the February 2 Order.  The issue there was whether the President's proclamation of a national monument on certain offshore federal lands insulated those lands from subsequent congressional direction.  The President had proclaimed the national monument in 1949, and in 1953 Congress had given the states title to submerged lands within three miles of the coast.  The U.S. argued that the 1949 reservation of the submerged lands under the Antiquities Act put them beyond the reach of the 1953 statute.  The Court disagreed, finding nothing in the Antiquities Act that "operate[s] to escalate the underlying claim to the United States to the land in question."  Id. at 41.

---

[5]  Federal grazing permits do not carry with them any property rights, and the BLM has broad authority to decide not to renew grazing permits in order to devote the lands to another use.  See, e.g., 43 U.S.C. § 315b ("issuance of a [grazing] permit … shall not create any right, title, interest, or estate in or to the lands"); 43 U.S.C. § 1752 (broad federal authority over issuance and renewal of grazing permits); Public Lands Council v. Babbitt, 529 U.S. 728, 741-42 (2000).

1

2

3

4

5

6

7

8

9

10

     The matter before this Court, by contrast, has nothing to do with land ownership. Indeed, <u>California</u> actually undercuts this Court's Order, because the Supreme Court recognized that a monument proclamation can cause the land to be "shifted from one federal use … to another." <u>Id</u>. at 40.  This is precisely what the President was contemplating when he directed BLM to consider whether grazing was compatible with the protective purposes of the Sonoran Desert National Monument, and it is precisely what the President has done in providing specific management directions in numerous other monument proclamations.[6]

11

12

13

14

15

16

17

18

19

20

21

22

     Finally, it bears emphasis that the management prescriptions that form the basis of WWP's challenge are directly related to protection of the "objects of historic and scientific interest" identified in the Proclamation.  These objects include flora, fauna, and archeological and historic sites that could be interfered with or substantially impaired by the grazing of domestic livestock.  For example, the Proclamation notes that the area reserved contains a "functioning desert ecosystem with an extraordinary array of biological, scientific, and historic resources."  Further, the "monument's biological resources include a spectacular diversity of plant and animal species."  The Monument also contains "abundant saguaro cactus forests … [which] are a national treasure, rivaling those within the Saguaro National Park."  66 Fed. Reg. 7354.

23

24

25

     The Proclamation went on to draw a direct connection between livestock grazing and the objects to be protected:

26

27

28

---

[6] For a full discussion of the President's authority to guide executive branch agencies in their administration of federal statutes, <u>see</u> Elena Kagan, <u>Presidential Administration</u>, 114 Harv. L. Rev. 2245, 2250, 2320-64 (2001).  Professor Kagan, Dean of Harvard Law School, has been nominated by President Obama to be Solicitor General of the United States.

1
2
3
4
5
6

The rich diversity, density, and distribution of plants in the Sand Tank Mountains area of the monument is especially striking and can be attributed to the management regime in place since the area was withdrawn for military purposes in 1941. In particular, while some public access to the area is allowed, no livestock grazing has occurred for nearly 50 years. To extend the extraordinary diversity and overall ecological health of the Sand Tanks Mountains area, land adjacent and with biological resources similar to the area withdrawn for military purposes should be subject to a similar management regime to the fullest extent possible.

7
8
9
10
11
12
13
14

Id. Thus it was logical and appropriate for the President to direct the federal land manager to allow livestock grazing on a portion of the monument to continue "only to the extent" the land manager determines that it "is compatible with the paramount purpose of protecting the objects identified in this proclamation."  66 Fed. Reg. at 7356.  The conclusion in the February 2 Order that this directive is "not sufficiently related to the [Antiquities] Act to be a valid exercise of the Act's delegated authority" is erroneous.

15

**III.    BLM'S FAILURE TO COMPLY WITH THE SONORAN DESERT PROCLAMATION IS NOT IMMUNE FROM JUDICIAL REVIEW.**

16
17
18
19
20
21
22
23
24
25
26
27
28

BLM has never questioned the President's authority to issue the management directives WWP seeks to enforce in this case.  Rather, the agency argued in its motion to dismiss that its failure to comply with those directives was immune from judicial review because the agency's actions are "presidential actions" that are not subject to review under the Administrative Procedure Act (APA).  BLM Motion at 11-13.  BLM's argument fundamentally misunderstands WWP's challenge.  WWP is not challenging any presidential action or decision.  To the contrary, WWP's goal is to force BLM to take the agency actions necessary to comply with President Clinton's decision in the Sonoran Desert Proclamation.  This Court recognized that "[i]t is undisputed that '[p]residential proclamations and [executive] orders have the force and effect of laws when issued pursuant to a statutory mandate or delegation of authority from Congress.'"  Order at 10

1    (citations omitted).  Because WWP challenges BLM's failure to comply with specific

2    presidential commands – commands that have the force of law – WWP's claims are

3    reviewable under the APA.

4

5         **A.**    **An Agency's Failure To Comply With Presidential Orders Is**
                 **Reviewable Under The APA.**

6
           WWP's first claim challenges BLM's failure to complete the Monument
7

8    management plan and grazing compatibility study required by the Proclamation.[7]  This is

9    not a challenge to a presidential order.  It is something fundamentally different: a challenge

10   to an agency's failure to abide by that order.  The Ninth Circuit has held repeatedly that

11   courts may review such challenges.  See City of Carmel-By-The-Sea v. U.S. Dep't of

12
     Transp., 123 F.3d 1142, 1165-66 (9th Cir. 1997); Sierra Club v. Peterson, 705 F.2d 1475,
13

14   1478-79 (9th Cir. 1983); Legal Aid Soc'y of Alameda County v. Brennan, 608 F.2d 1319,

15   1329-32 (9th Cir. 1979); see also City of Albuquerque, 379 F.3d at 913-16; S. Utah

16
     Wilderness Alliance v. Sierra, 2008 WL 4643003, at *3 & n.3 (D. Utah 2008).  An
17

18   executive order is enforceable when it meets three requirements: (1) the Order has a

19   "specific statutory foundation;" (2) it does not preclude judicial review; and (3) it contains

20   "law to apply."  City of Carmel-By-The-Sea, 123 F.3d at 1165-66; City of Albuquerque,

21
     379 F.3d at 913-16.  As WWP explained in its Opposition to the Motion to Dismiss, and as
22

23   BLM never disputed, all three requirements are met here.  See WWP Opp. at 15-16; BLM

24

25

26

27   _____
     [7] WWP brought this claim pursuant to § 706(1) of the APA, which requires a court to
28   "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).
     Norton v. SUWA, 542 U.S. 55, 61-62 (2004) (courts have jurisdiction under the APA to
     hear a claim that an agency has illegally withheld or unreasonably delayed taking a specific
     action required by law).

Reply at 9.[8]  Accordingly, this Court has jurisdiction to hear WWP's challenge to BLM's failure to comply with the Proclamation.

**B.      The Actions Challenged By WWP Are Not Presidential Actions.**

BLM tries to evade judicial review by arguing that actions taken pursuant to the Sonoran Desert Proclamation are themselves "presidential" actions not subject to APA review.  BLM Motion at 11-13; see Franklin v. Massachusetts, 505 U.S. 788, 800-01 (1992) (President is not an "agency" within the meaning of the APA); Dalton v. Specter, 511 U.S. 462, 469-70 (1994) (same).  The only "presidential actions" immune from APA review, however, are decisions made by the President himself.  The cases relied upon by BLM do not prove otherwise.  In Franklin and Dalton, the Court refused to review claims challenging preliminary agency reports completed before the President acted because they were not "final agency action" as required by the APA.  Franklin, 505 U.S. at 796; Dalton, 511 U.S. at 469-70.  Because the President – not the agency – made the final decision, APA review was not available.  Franklin, 505 U.S. at 796; Dalton, 511 U.S. at 469-70 ("What is crucial is the fact that '[t]he President, not the [agency], takes the final action that affects' the military installations."); see Public Citizen v. U.S. Trade Representative, 5 F.3d 549, 552 (D.C. Cir. 1993) ("Franklin is limited to those cases in which the President has

---

[8]  BLM claims these cases are distinguishable because the agencies' authority to take the challenged action did not "derive[] from a Presidential Proclamation."  BLM Reply at 9.  However, BLM does not "derive its authority" to prepare a management plan or grazing determination from the proclamation in this case.  See 43 U.S.C. § 1712 (FLPMA's land use planning provision); 43 U.S.C. § 1752 (FLPMA's grazing permit provision); 43 U.S.C. § 315b (Taylor Grazing Act).  See also text supra at 10 (noting that BLM prepares management and grazing plans pursuant to its authority under FLPMA and other federal law).  The Sonoran Desert Proclamation did not provide BLM with planning authority it lacked; it provided BLM with management direction with which it must comply.  Compliance with this presidential direction is mandatory and, as explained supra, failure to comply is subject to review under the APA.  In any case, executive orders have the force of law and are enforceable regardless of whether the agency is taking an action required by other statutory authorities.  See, e.g., S. Utah Wilderness Alliance, 2008 WL 4643003, *3 & n.3 (holding executive order enforceable where plaintiff challenged BLM's failure to close road to off-road vehicles as required by order).

14

final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties."). Because this case unquestionably concerns final BLM actions and inactions rather than those of the President, <u>Franklin</u> and <u>Dalton</u> are inapposite.

Further, lower courts have repeatedly affirmed that they may review agency actions taken pursuant to a presidential order under the APA. For example, in <u>Chamber of Commerce of the U.S. v. Reich</u>, 74 F.3d 1322 (D.C. Cir. 1996), the D.C. Circuit concluded that the plaintiffs could have brought an APA claim challenging the Secretary of Labor's regulations implementing an executive order. <u>Id</u>. at 1326-27 (noting "that the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA"). Similarly, the D.C. District Court rejected the Secretary of the Navy's argument that his implementation of an executive order was unreviewable under <u>Dalton</u>. <u>Nation v. Dalton</u>, 107 F. Supp. 2d 37, 43 n.5 (D.D.C. 2000); <u>see also</u> <u>California ex rel. Lockyer v. U.S. Forest Serv.</u>, 465 F. Supp. 2d 942 (N.D. Cal. 2006) (APA challenge to management plan required by national monument proclamation); <u>Milena Ship Mgmt. Co. v. Newcomb</u>, 804 F. Supp. 846, 848-50 (E.D. La. 1992) (court upholding judicial review of agency action taken pursuant to an executive order).

Despite the numerous cases – many from the Ninth Circuit – holding that an agency's failure to comply with a presidential mandate is subject to APA review, the agency relies entirely on <u>Tulare County v. Bush</u>, 185 F. Supp. 2d 18 (D.D.C. 2001), a D.C. district court decision that was affirmed, <u>on other grounds,</u> by the D.C. Circuit. BLM Motion at 12. The district court in <u>Tulare County</u> dismissed plaintiffs' claims challenging the Forest Service's management of the Giant Sequoia National Monument on the grounds

that the Forest Service was "merely carrying out the directives of the President." Id. at 28-

29.  On appeal, however, the D.C. Circuit declined to approve the district court's

interpretation.[9]  Indeed, the court cast significant doubt on the district court's rationale

when it recognized that plaintiffs challenged "non-presidential actions of the Forest Service

… allegedly showing that the Service is not acting consistently with the Proclamation."

Tulare County v. Bush, 306 F.3d 1138, 1143 (D.C. Cir. 2002) (emphasis added).  The D.C.

Circuit dismissed the claims because the Forest Service actions challenged were not

identified "with sufficient specificity to state a claim" – not because they were

unreviewable presidential actions as BLM insists here.  Id.

Here, too, because WWP is challenging BLM's failure to comply with the

President's order – not the President's order itself – this claim is reviewable under the

APA.

## CONCLUSION

The Antiquities Act has been one of the Nation's most successful conservation laws,

resulting in the preservation of some of America's most special places for present and

future generations to appreciate and enjoy.  The President's authority to specify how these

special places are to be managed to carry out the Act's protective purposes should be

carefully safeguarded.  For the foregoing reasons, Amici Natural Resources Law Professors

and Practitioners ask this Court to grant WWP's motion for reconsideration and make clear

that the President has the authority to include management prescriptions in National

---

[9]   Because the D.C. Circuit affirmed on other grounds, this Court should not accord the
district court's opinion persuasive authority.  See Zurich Ins. Co. v. Amcor Sunclipse North
America, 241 F.3d 605, 608 (7th Cir. 2001) (district court's opinion has "negligible
authority" because court of appeals affirmed on other grounds); R.C.M. Executive Gallery
Corp. v Rols Capital Co., 901 F. Supp. 630, 637 (S.D.N.Y. 1995) (appeals court's refusal
to affirm on same grounds as district court "indicates that the Court of Appeals was not
prepared to accept" the district court's reasoning).

1   Monument proclamations and that BLM's non-compliance with these prescriptions is

2   subject to judicial review.

3

4

5

6       Dated: March 13, 2009                    Respectfully submitted,

7

8                                                *s/ James S. Angell*
                                                 James S. Angell
9                                                John D. Leshy

10                                               Attorneys for Amici Curiae Professors
                                                 of Natural Resources Law
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

# CERTIFICATE OF SERVICE

3

I hereby certify that on this 13th day of March, 2009, I filed a true and exact copy of

4

Brief of Amicus Curiae Natural Resource Law Professors and Practitioners in Support of
Motion for Reconsideration, with the Court's CM/ECF system, which will generate a

5

Notice of Filing and Service on the following:

6

Donna S. Fitzgerald

7

Donna.Fitzgerald@usdoj.gov

8

Richard Glenn Patrick
richard.patrick@usdoj.gov

9

10

Erik B. Ryberg

11

ryberg@seanet.com

12

Lauren M. Rule
lrule@advocateswest.org

13

14

15

*s/James S. Angell*

16

James S. Angell

17

18

19

20

21

22

23

24

25

26

27

28