Alexander Hays V (Oregon State Bar #063522), *pro hac vice*
Public Lands Counsel
NATIONAL TRUST FOR HISTORIC PRESERVATION
535 16th Street, Suite 750
Denver, CO 80202
(303) 623-1504
(303) 623-1508 (fax)
alexander_hays@nthp.org

Attorney for Amici

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>)<br>BUREAU OF LAND MANAGEMENT, )<br>)<br>Defendant. )<br>) | Case No. CV 08-1472-PHX-MHM<br><br>**AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR RECONSIDERATION** |

## INTRODUCTION

On February 2, 2009, this Court granted the Bureau of Land Management's (BLM's) Motion to Dismiss plaintiff's complaint, on the grounds that the Court lacked jurisdiction under the Administrative Procedure Act (APA), 5 U.S.C. § 706, to review BLM's failure to comply with specific management requirements in the 2001 Proclamation establishing the Sonoran Desert National Monument. This Court's opinion granting the Motion to Dismiss, however, included broad statements that extend well beyond the legal issues raised by the parties in the case, calling into question both the scope of the President's authority under the Antiquities Act of 1906, and the facial validity of the 2001 Proclamation itself. Order at 11. These statements – that the President lacks authority under the Antiquities Act to include management directives in national monument proclamations, and that the Sonoran Desert Proclamation is not a "valid exercise" of the President's authority, id. – have the dangerous potential to cast a legal cloud on all national

monuments. At the very least, the Court's statements will generate enormous confusion regarding the applicable legal standards for management, and for judicial review of agency actions, within national monuments around the country, especially those monuments managed by the Bureau of Land Management (BLM).

The National Trust for Historic Preservation, Society for American Archaeology, and Lawyers' Committee for Cultural Heritage Preservation (collectively, Amici) believe that the Court's statements are erroneous as a matter of law and inconsistent with the purposes of the Antiquities Act and Supreme Court precedent "confirming the broad power delegated to the President under the Act." Mountain States Legal Found. v. Bush, 306 F.3d 1132, 1135 (D.C. Cir. 2002) (citing United States v. California, 436 U.S. 32 (1978); Cappaert v. United States, 426 U.S. 128 (1976); Cameron v. United States, 252 U.S. 450 (1920)). Accordingly, we urge the Court to reconsider and revise its decision.

In 1906, reports of pervasive looting and unregulated excavations of archaeological sites on federal public lands moved Congress to pass the Antiquities Act. Congress' primary goal in doing so is stated plainly in the text of the legislation: to ensure "the proper care and management of the [historic and scientific] objects" within areas of the public lands reserved as national monuments. 16 U.S.C. § 431 (emphasis added).[1] To achieve this goal, the Antiquities Act approved sanctions for those convicted of appropriating, excavating, or otherwise harming objects of antiquity on the public lands without prior permission from the federal government. Id. § 433. Additionally, the Act authorized the President to designate and "reserve" "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest" as national monuments. Id. § 431. Since 1906, the President has relied on this authority to establish over 100 national monuments throughout the United States, including over twenty within the past fifteen years. Utah Assoc. of Counties v. Bush, 316 F. Supp. 2d 1172, 1178 (D. Utah 2004).

Thus, the President has played – and continues to play – a consequential role in protecting significant historic and scientific resources on the public lands through the use

1 See also Mark Squillace, The Monumental Legacy of the Antiquities Act, 37 Ga. L. Rev. 473, 477 (2003) ("There seems little doubt that the impetus for the law that would eventually become the Antiquities Act was the desire of archaeologists to protect aboriginal objects and artifacts.") (emphasis added).

of his authority under the Act to designate national monuments.[2] Because this Court's decision could be construed to substantially limit that authority, Amici respectfully urge this Court to grant Plaintiff's Motion for Reconsideration.

## ARGUMENT

### I. THE ANTIQUITIES ACT DELEGATES MANAGEMENT AUTHORITY OVER NATIONAL MONUMENTS TO THE PRESIDENT.

Ordinary principles of statutory interpretation govern this case. In order to discern congressional intent, a court must first give effect to the plain meaning of a statute. Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997). To the extent a statute contains ambiguous language, a court may turn to legislative history for interpretive guidance. United States v. Davidson, 246 F.3d 1240, 1246 (9th Cir. 2001). Further, congressional acquiescence may inform a court's interpretation of ambiguous statutory provisions. Bob Jones Univ. v. United States, 461 U.S. 574, 600–01 (1983). Applying these principles here, Congress clearly intended for the President to have the authority under the Antiquities Act to require the agency actions at issue in this case.

#### A. The Plain Language of the Antiquities Act Authorizes the President to Manage National Monuments.

The Court's narrow interpretation of presidential authority under the Act is not supported by the plain language of the statute. When interpreting a statute, a court must first "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Robinson, 519 U.S. at 340. "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Id. at 341. A court also must evaluate "the structure of the law as a whole

---

[2] As recently as January 6, 2009, President George W. Bush designated a number of national monuments covering hundreds of thousands of square miles, including a number located in the Pacific Ocean: the Northwestern Hawaiian Islands, World War II Valor in the Pacific, Marianas Trench, Pacific Remote Islands, and Rose Atoll Marine National Monuments. Bryan Walsh, "President Bush's Last Act of Greenness," TIME, Jan. 6, 2009, *available at* http://www.time.com/time/health/article/0,8599,1869917,00.ht ml (last visited Mar. 13, 2009).

including its object and policy." United States v. Lopez-Perera, 438 F.3d 932, 933 (9th Cir. 2006).

In this case, the Supreme Court has already ruled that the Antiquities Act contains a broad delegation of authority to the President. See, e.g., Cappaert v. United States, 426 U.S. at 141–42. The sole restriction on the President's authority is that the national monument must "be confined to the smallest area compatible with the proper care and management of the objects to be protected." 16 U.S.C. § 431; see also Mountain States Legal Found., 306 F.3d at 1137 ( "[T]he court is necessarily sensitive to pleading requirements where, as here, it is asked to review the President's actions under a statute that confers very broad discretion on the President and separation of powers concerns are presented"). It is thus indisputable that the plain language of the statute conveys "very broad discretion" to the President in protecting monument objects. See Tulare County v. Bush, 306 F.3d 1138, 1141 (D.C. Cir. 2002).

Further, the context of the Antiquities Act's grant of authority supports the interpretation that the President is empowered to provide management directives in the national monument proclamations. The Antiquities Act is more than simply a mechanism for the President to recognize parcels of the public lands as national monuments, as this Court apparently assumed. Order at 11. The Act specifically and repeatedly refers to "the proper care and management of the objects to be protected." 16 U.S.C. § 431 (emphasis added). This language directly contradicts the Court's interpretation that the Act "does not amount to a statutory mandate or delegation of authority from Congress to the President for the purpose of managing the monuments established under the Act." Order at 11.

To support its interpretation, the Court relies on one sentence from United States v. California, 436 U.S. 32, 40 (1978), which was taken out of context.[3] However, the Court's

[3] United States v. California involved an underlying dispute as to whether the State of California or the federal government had dominion over the submerged lands and waters within the Channel Islands National Monument. In concluding that dominion lies with California, the Supreme Court explained that a "reservation for a national monument purpose cannot operate to escalate the underlying claim of the United States to the land in question." U.S. v. California, 436 U.S. at 41. It was in this context of a federal-state land dispute that the Supreme Court commented, "A reservation under the Antiquities Act thus means no more than that the land is shifted from one federal use, and perhaps from one federal managing agency, to another." Order at 11 (quoting U.S. v. California, 436 U.S. at 40) (footnote omitted). Thus, the Supreme Court's statement simply cannot be construed to imply that the Antiquities Act fails to delegate authority to the President to "manage" national monuments, especially when the plain language and purpose of the Act confirm

interpretation ignores the plain language and purpose of the Antiquities Act. Courts should be cautious in interpreting a statute in such a way that eliminates (or diminishes) the express purpose for the statute's passage. See John v. United States, 247 F.3d 1032, 1036–37 (9th Cir. 2001) (per curiam) (quoting New York State Dep't of Soc. Servs. v. Dublino, 413 U.S. 405, 419–20 (1973)) (The court "must not 'interpret federal statutes to negate their own stated purposes.'").

In short, the Court's overly constrained interpretation of the Antiquities Act does not reflect the plain meaning of the statute or its express purpose. The logical connection between the Act's purpose – to protect objects of historic or scientific interest – and the President's use of management directives to effectuate that purpose, cannot be severed.

**B. The Legislative History of the Antiquities Act Shows That Congress Intended the President to Manage and Protect National Monuments.**

Even if the plain language of the Antiquities Act was ambiguous, the legislative history shows that Congress intended to delegate authority to the President to manage national monuments for the purpose of protecting historic and scientific objects. "Where the plain language of a statute is ambiguous, a court may go beyond the words of the statute 'to examine the textual evolution of the [contested language] and the legislative history that may explain or elucidate it.'" United States v. Davidson, 246 F.3d at 1246 (quoting United States v. R.L.C., 503 U.S. 291, 298 (1992)). Moreover, "even the most basic principles of statutory construction must yield to clear contrary evidence of legislative intent." National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers, 414 U.S. 453, 458 (1974).

In the late 1870s, national and international interest in the archaeological and historic sites of the American Southwest increased dramatically. Ronald F. Lee, The Origins of the Antiquities Act, in THE ANTIQUITIES ACT: A CENTURY OF AMERICAN ARCHAEOLOGY, HISTORIC PRESERVATION, AND NATURE CONSERVATION 15 (David Harmon et al. eds., 2006). Along with this interest, the demand for "authentic prehistoric objects" arose among collectors, which led to an increase in looting, vandalism, and ultimately the destruction of many sites on the public lands.[4] Id. at 22-23. As described by

the opposite interpretation.

[4] One notable example that generated concern among archaeologists and the general public

one scholar, a desire to "reach a ruin rich in valuable objects before" someone else did fueled the demand, and led to a "rush on prehistoric ruins of the Southwest that went on, largely unchecked, until about 1904." Id. at 23.

Congress did not become aware of the looting activities being carried out in the Southwest until the early 1880s. In 1881, a report prepared by archaeologist Adolph Bandelier for the Archaeological Institute of America recounted the destruction of the Pecos Pueblo site near Santa Fe, New Mexico. Richard W. Sellers, A Very Large Array: Early Federal Historic Preservation – The Antiquities Act, Mesa Verde, and the National Park Service Act, 47 NAT. RES. J. 267, 274-76 (2007). This report alarmed the members of the Archaeological Institute, which included Senator George F. Hoar of Massachusetts. Id. at 275. Senator Hoar responded by introducing a petition to the Senate in May 1882 condemning those who plundered and destroyed archaeological sites, and recommending federal preservation for those sites. Id. at 275. Although Congress failed to act on the petition, it marked the first formal recommendation for the preservation of archaeological sites in Congress.

In 1889, Senator Hoar petitioned Congress again, this time to preserve Casa Grande – a centuries old, multi-storied structure in Arizona built by a former civilization known as the Hohokam that once occupied central and southern Arizona. Id. Senator Hoar based his petition on reports of vandalism and erosion from nearby irrigation projects. Id. Congress responded favorably to the petition when, on March 2, 1889, it appropriated $2,000 for the purpose of repairing and protecting Casa Grande. Lee, supra, at 20. Congress also authorized the President to create the nation's first "archaeological" reserve and to include in the reservation as much of the public lands "as in his judgment may be necessary" for the protection of Casa Grande. Sellers, supra, at 275.

---

was the excavation of Pueblo Bonito at Chaco Canyon in New Mexico. Ronald F. Lee, The Origins of the Antiquities Act, in THE ANTIQUITIES ACT: A CENTURY OF AMERICAN ARCHAEOLOGY, HISTORIC PRESERVATION, AND NATURE CONSERVATION 26 (David Harmon et al. eds., 2006) (citing Lloyd M. Pierson, A History of Chaco Canyon National Monument 48–55 (1956) (unpublished manuscript, on file with the Division of Archaeology, National Park Service, Washington, D.C.)). From 1896-99, with funding from wealthy philanthropists and antiquities collectors, Richard Wetherill excavated 198 rooms and kivas at Pueblo Bonito, removing all the artifacts that he discovered. Id. This outraged many archaeologists and led to an investigation by the General Land Office, which in turn increased congressional awareness and public concern that these resources needed protection. Id.

During this same period, public support grew for the preservation of Civil War battlefields. In the 1890s, Congress created the first five national Civil War battlefield parks. Id. at 288. Congressman John Lacey of Iowa, a Civil War veteran, played an active role in this effort, and also developed an interest in protecting and preserving America's antiquities. Id. at 288-90. In 1900, a six-year effort to pass the Antiquities Act began, and Congressman Lacey introduced the bill that eventually passed in 1906. See generally Ronald F. Lee, The Story of the Antiquities Act, Chapter 6 – The Antiquities Act 1900-06, *available at* http://www.nps.gov/history/archeology/PUBS/LEE /Lee_CH6.htm (last visited Mar. 12, 2009); Raymond Harris Thompson, Hewitt and the Politics of Archaeology, in THE ANTIQUITIES ACT: A CENTURY OF AMERICAN ARCHAEOLOGY, HISTORIC PRESERVATION, AND NATURE CONSERVATION 35, 43 (David Harmon et al. eds., 2006).

Thus, the twenty-five years leading up to the passage of the Antiquities Act in 1906 reflected the need not only to retain ownership of federal lands with significant historic and scientific objects, but also to protect those objects from destructive forces.

> Much of the literature on the Antiquities Act appropriately emphasizes the importance of the authority to create national monuments, natural and scenic as well as archaeological and historical, but the primary purpose of the act was to 'preserve American antiquities'. . . . Protecting archaeological sites was a clearly articulated purpose based on sound principles that have given structure to the development of the nation's archaeological policies ever since.

Id. at 44; see also Sellers, supra, at 292-93 (quoting a June 15, 1906 letter from Congressman Lacey to W.H. Holmes, Head of the Bureau of American Ethnology: "I have no doubt this law can be so construed as to protect substantially all the important ruins yet remaining on the public lands in the Southwest."). Although the legislative historyc for the Antiquities Act is very modest, a brief exchange between Congressman Lacey and Congressman John H. Stephens of Texas reveals that the purpose of the Antiquities Act was "to preserve . . . old objects of special interest and the Indian remains in the pueblos in the Southwest." 40 Cong. Rec. 7,888 (June 5, 1906). Additionally, the Senate and House bills were presented expressly "for preservation of American antiquities. . . ." Id. at 7,331. Thus, even the sparse legislative history of the Antiquities Act strongly supports the conclusion that Congress intended for the President to have the authority to manage national monuments.

### C. Congress Has Acquiesced in the President's Authority Under the Antiquities Act to Provide for the Management of National Monuments.

In addition to the plain language and legislative history of the Antiquities Act, the President's authority to include management directives in national monument proclamations under the Antiquities Act is also supported by Congress' acquiescence in the President's broad exercise of that authority. Courts may resolve statutory ambiguities, if they exist, by relying on Congress' express or implied acquiescence in an executive branch interpretation.[5] Bob Jones Univ., 461 U.S. at 600; Cannon v. Univ. of Chicago, 441 U.S. 677, 702-03 (1979); Stephenson v. Shalala, 87 F.3d 350, 355 (9th Cir. 1996). Here, Congress has expressly acquiesced in the President's assertion of authority under the Act to manage national monuments by passing legislation recognizing the existence of this authority. Further, Congress has repeatedly declined to enact legislation that would have curtailed presidential authority under the Act, and thus has acquiesced in the President's broad authority by implication.

#### 1. Congress has expressly acquiesced in the authority of the President to manage national monuments under the Act.

Congress has recently approved legislation that demonstrates express acquiescence in presidential authority under the Act to manage national monuments. For example, in 2000, President Clinton issued a proclamation expanding the Craters of the Moon National Monument in Idaho, and directing the National Park Service (NPS) and BLM to jointly manage the newly designated area.[6] Proclamation No. 7373, 65 Fed. Reg. 69,221 (Nov. 9,

---

[5] In Northwest Envtl. Advocates v. EPA, 537 F.3d 1006 (9th Cir. 2008), the Ninth Circuit held that "the standard for a judicial finding of congressional acquiescence is extremely high." Id. at 1022. That standard is satisfied here, because Congress has expressly endorsed the authority over the management of national monuments claimed by the president under the Antiquities Act. See Pub. L. No. 107-213, 116 Stat. 1052 (2002); Department of the Interior and Related Agencies Appropriations Act, Pub. L. No. 107-63, 115 Stat. 414 (2002). Conversely, in Northwest Envtl. Advocates v. EPA, the Ninth Circuit determined that Congress had merely been "aware" of the regulation supporting the authority asserted by EPA, but had not actually taken steps to endorse the regulation. Id. at 1023-24.

[6] In the proclamation, President Clinton cited only the Antiquities Act as authorizing him to expand Craters of the Moon National Monument and include management directives in the proclamation. Proclamation No. 7373, 65 Fed. Reg. 69,221, 69,222 (Nov. 9, 2000). In this regard, the proclamations for Craters of the Moon and Sonoran Desert are indistinguishable. Compare id. with Proclamation No. 7397, 66 Fed. Reg. 7354, 7355.

2000). Because the NPS interprets its organic act to require specific authorization from Congress to allow hunting in park areas, 36 C.F.R. § 2.2.(b)(1); Nat'l Rifle Ass'n v. Potter, 628 F. Supp. 903, 906-07 (D.D.C. 1986), the proclamation had the effect of banning hunting within the area jointly managed by the two agencies. Congress responded to this situation by passing legislation directing the NPS "to permit hunting on lands within the Craters of the Moon National Preserve. . . ."[7] Pub. L. No. 107-213, 116 Stat. 1052 (2002).

Clearly, the fundamental premise underlying Congress' decision to specifically modify the management directives applicable to the National Monument was the explicit recognition that the President had the authority in the first instance to impose management directives resulting from the proclamation. Thus, in passing this legislation, Congress expressed its belief that the Antiquities Act authorizes the President to do more than simply create or enlarge the boundaries of a national monument, but also to include management directives in the governing proclamation.[8]

Two years later, Congress again expressly recognized the President's authority under the Act to manage national monuments. In a 2002 appropriations bill for the Department of the Interior, Congress directed that

> [n]o funds provided in this Act may be expended to conduct preleasing, leasing and related activities under either the Mineral Leasing Act (30 U.S.C. 181 et seq.) or the Outer Continental Shelf Lands Act (43 U.S.C. 1331 et seq.) within the boundaries of a National Monument established pursuant to the Act of June 8, 1906 (16 U.S.C. 431 et seq.) as such boundary existed on January 20, 2001, except where such activities are allowed under the Presidential proclamation establishing such monument.

Department of the Interior and Related Agencies Appropriations Act, Pub. L. No. 107-63, 115 Stat. 414 (2002) (emphasis added).[9] Like the bill directing the Secretary of the Interior to permit hunting within the Craters of the Moon National Preserve, Congress again

---

[7] Congress renamed the area added to the national monument by President Clinton as the "Craters of the Moon National Preserve." Pub. L. No. 107-213, 116 Stat. 1052 (2002).

[8] For example, the proclamation expanding the Craters of the Moon included a prohibition on all off-road vehicles, and a requirement to prepare a transportation plan, for the purpose of protecting the significant objects in the monument, Proclamation No. 7373, 65 Fed. Reg. 69,221 (Nov. 9, 2000) – requirements that are closely analogous to those included in the proclamation for the Sonoran Desert National Monument.

[9] Congress has continued this prohibition through subsequent appropriations bills for the Interior Department. See, e.g., Omnibus Appropriations Bill 2009, Pub. L. No. 111-8, § 411, 123 Stat. 524 (Mar. 11, 2009).

expressly recognized and endorsed the President's authority under the Act to determine how national monuments should be managed.

**2. Congress has acquiesced by implication in the authority of the President under the Act to manage national monuments.**

In addition to these examples of express acquiescence, Congress has also acquiesced by implication in the authority of the President to manage national monuments, by declining to pass legislation limiting presidential authority under the Antiquities Act. According to the Ninth Circuit, failed legislation is entitled to "some weight." Wilshire Westwood Assocs. v. Atlantic Richfield Corp., 881 F.2d 801, 808 (9th Cir. 1989). Here, Congress has considered but declined to enact several bills in recent years that would have limited presidential authority under the Act. Consequently, this Court must interpret the scope of presidential authority under the Antiquities Act in light of Congress' decision not to enact those bills.

In 1997, Congress considered and rejected a bill to restrict presidential authority under the Act, in large part due to President Clinton's designation of the Grand Staircase-Escalante National Monument.[10] National Monument Fairness Act of 1997, H.R. 1127, 105th Cong. (1997); Christine A. Klein, Preserving Monumental Landscapes Under the Antiquities Act, 87 CORNELL L. REV. 1333, 1389-91 (2002). The bill would have caused a national monument proclamation to expire unless Congress approved legislation within two years to make the designation permanent. Id. § 2. The bill also would have required the President to engage in a consultation process with the governor of the affected state prior to issuing a national monument proclamation. Id. Taken as a whole, this bill would have drastically limited the President's authority to permanently reserve areas as national monuments and to act swiftly to protect threatened areas worthy of national monument designation.

During the following session, Congress again rejected another bill designed to limit presidential authority under the Antiquities Act. National Monument NEPA Compliance

---

[10] The proclamation for the Grand Staircase-Escalante National Monument included specific management directives. Proclamation No. 6920, 61 Fed. Reg. 50,223 (Sept. 18, 1996). Thus, the clear result of Congress' decision not to enact the 1997 bill implicitly recognized the President's authority to issue those management directives.

Act, H.R. 1487, 106th Cong. (1999). This bill would have required the preparation of environmental impact statements for national monument proposals along with a ten-month period of public review and comment before a proclamation could go into effect. Id. § 3. Once more, Congress chose not to enact a bill that would have imposed direct limitations on the President's authority under the Act.

The foregoing demonstrates Congress' clear awareness of how the President has interpreted his authority under the Act. Further, Congress' decision to reject legislation proposed for the specific purpose of limiting authority shows that Congress has acquiesced in the Presidents' exercise of that authority. For this reason, this Court should accord considerable weight to the failed legislation discussed above.

## II. THE COURT'S DECISION UPSETS THE WELL-ESTABLISHED MANAGEMENT SCHEME GOVERNING NATIONAL MONUMENTS.

For over a century, presidents have used their authority under the Antiquities Act to designate prehistoric and historic landmarks, structures, and objects as national monuments. During this time, presidents have also exercised their authority under the Act to ensure "the proper care and management of the objects to be protected," 16 U.S.C. § 431, by including management directives in national monument proclamations.[11]

Like their predecessors, contemporary presidents have continued to assert the authority to manage national monuments through the terms of their proclamations. The proclamation for the Sonoran Desert is consistent with prior proclamations in requiring the agency with management authority over the area (in this case BLM) to take specific actions to protect the objects, including preparation of a resource management plan. In fact, many of the national monument proclamations issued by President Clinton contain planning requirements, and also require BLM to prohibit or restrict certain uses within the

[11] For instance, in 1918, President Woodrow Wilson issued a proclamation establishing Casa Grande National Monument "in order that better provision may be made for the protection, preservation and care of the ruins of the ancient buildings and other objects of prehistoric interest thereon. . . ." Proclamation No. 1470, 40 Stat. 1818. Five years later, President Harding declared Bryce Canyon National Monument (now National Park) to be the "dominant reservation" and specifically prohibited "any use of the land which interferes with its preservation or protection. . . ." Proclamation No. 1664, 43 Stat. 1914. Calvin Coolidge and Herbert Hoover included this very same management prescription in national monument proclamations issued during their presidencies. See, e.g. Proclamation No. 1692, 43 Stat. 1946 (Chiricahua National Monument, Arizona); Proclamation No. 1877, 46 Stat. 2993 (Holy Cross National Monument, Colorado).

designated area, such as grazing, oil and gas leasing, and off-road vehicle use.[12] See, e.g., Proclamation 7398, 66 Fed. Reg. 7359, 7361 (Jan. 17, 2001) (requiring preparation of a transportation plan and prohibiting off-road vehicle use in the proclamation for Upper Missouri River Breaks National Monument).

Where the national monument proclamations issued by President Clinton and their historical antecedents differ is in the agency assigned to administer the reserved area. Prior to 1996, presidents placed the vast majority of national monuments created by proclamation under the care and management of the National Park Service. Squillace, supra, at 524. President Clinton broke from this practice between 1996 and 2001 when he assigned the management of fourteen national monuments either in whole or in part to BLM. Id. at 508–09. For each national monument assigned to BLM, the president ordered the agency to manage the area "to implement the purposes" of the proclamation, which include protecting the objects for which the president made the reservation. See, e.g., Proclamation No. 7317, 65 Fed. Reg. 37,243, 37,244-45 (June 9, 2000) (establishing Canyons of the Ancients National Monument in Colorado).

However, if this Court's narrow interpretation were correct, and the delegation of authority to the President under the Antiquities Act related only to the "establishment" of national monuments, Order at 11, then the management requirements within each proclamation where the Antiquities Act provides the sole "specific statutory foundation" would be presumptively invalid. In that case, BLM would be free to disregard the management directives in the presidential proclamation, and to pursue other management objectives and actions for the reserved areas, including those flatly inconsistent with the express purpose of the Antiquities Act – to protect significant objects of historic and scientific interest designated as national monuments. Such a result would surely frustrate the intent of the President in issuing the proclamations, and also that of Congress when it authorized the President to designate national monuments as a means of ensuring "the

---

[12] President George W. Bush also included detailed management requirements governing the national monuments that he created during his presidency. See, e.g., Proclamation No. 8336, 74 Fed. Reg. 1565 (Jan. 6, 2009) (establishing the Pacific Remote Islands Marine National Monument and requiring, among other actions, the preparation of a resource management plan for the area).

proper care and management of the objects to be protected" on the public lands. 16 U.S.C. § 431.

Further, this Court's order will lead to considerable confusion concerning the legal standard that governs national monuments established by presidential proclamation, in particular those managed by BLM. In the absence of more stringent protection requirements, BLM "manage[s] the public lands under principles of multiple use and sustained yield," 43 U.S.C. § 1732(a), which provides BLM with substantial discretion in determining how the public lands should be used, rather than placing paramount value on resource protection. If this management standard were to govern the national monuments administered by BLM, which would be the result of this Court's decision, then the management of national monuments would shift dramatically from resource protection to resource exploitation. This result fundamentally contradicts the purpose of the Antiquities Act.

## CONCLUSION

For the reasons set forth above, Amici believe that this Court should grant Plaintiff's Motion for Reconsideration and revise or rescind its order of February 2, 2009.

Dated this 13th day of March, 2009

Respectfully submitted,

/s/ Alexander Hays V

Alexander Hays V (OSB# 063522)

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of March, 2009, I caused a true and correct copy of the foregoing Amicus Brief to be electronically filed with the Clerk of the Court for the U.S. District Court for the District of Arizona using the CM/ECF System, which sent notification of such filing to the following counsel of record in this case:

Donna S. Fitzgerald
Donna.Fitzgerald@usdoj.gov

Richard G, Patrick
Richard.Patrick@usdoj.gov

Lauren M. Rule
lrule@advocateswest.org

Erik B. Ryberg
ryberg@seanet.com

/s/ Alexander Hays V
Alexander Hays V (OSB# 063522)