1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                      FOR THE DISTRICT OF ARIZONA

8

9    WESTERN WATERSHEDS PROJECT, )      No. CV 08-1472-PHX-MHM
                                   )
10            Plaintiff,           )      **ORDER**
                                   )
11   v.                            )
                                   )
12                                 )
     BUREAU OF LAND MANAGEMENT, )
13                                 )
              Defendant.           )
14                                 )
     _____ )

15

16        Currently before the Court is the Bureau of Land Management's Motion to

17   Dismiss Western Watersheds Project's Amended Complaint for lack of subject matter

18   jurisdiction and failure to state a claim pursuant to Rules 12(b)(1) and 12(b)(6) of the

19   Federal Rules of Civil Procedure.  (Dkt. #25).  After reviewing the pleadings and holding

20   oral argument on January 13, 2009, and May 13, 2009, the Court issues the following

21   order.

22   **I.      PROCEDURAL HISTORY**

23        On August 11, 2008, Plaintiff Western Watersheds Project ("WWP") filed a

24   Complaint against Defendant Bureau of Land Management ("BLM"), challenging the

25   BLM's renewal of grazing permits and subsequent annual grazing authorizations under

26   the Sonoran Desert National Monument Proclamation ("Proclamation"), Proclamation

27   No. 7397, 66 Fed. Reg. 7354 (Jan. 22, 2001).  (Compl., Dkt. #1, ¶¶ 75-78).  WWP also

28   alleges that the BLM has violated the Proclamation by failing to issue (1) a determination

1   as to whether livestock grazing is compatible with the purpose of protecting the natural

2   and historic resources on the Sonoran Desert National Monument ("SDNM" or

3   "Monument"), and (2) a management plan addressing the necessary actions to protect the

4   natural and historic resources on the Monument.  (Amend. Compl., Dkt. #9, ¶¶ 71-75).

5          Six days after filing its Amended Complaint on October 21, 2008, and prior to any

6   responsive pleading by the BLM, WWP filed a Motion for Summary Judgment and

7   Injunction.  (Dkt. #s 10-19).  WWP also filed a separate Motion for Permanent Injunction

8   on October 31, 2008.  (Dkt. #s 22-23).

9          On November 4, 2008, the BLM filed a Motion to Dismiss for lack of subject

10   matter jurisdiction and failure to state a claim under FRCP 12(b)(1) and 12(b)(6), and a

11   Motion to Stay briefing on WWP's Motions for Summary Judgment and Permanent

12   Injunction.  (Dkt. #s 24-26).  The Court held a hearing on November 18, 2008, and

13   granted the Motion to Stay.  (Dkt. #30).  The Court also directed expedited briefing on the

14   Motion to Dismiss and directed the BLM to compile the Administrative Record.  (Id.).  In

15   addition, WWP withdrew its Motions for Summary Judgment and Permanent Injunction.

16   (Id.).

17          On February 2, 2009, after holding oral argument, the Court issued an Order

18   granting the BLM's motion to dismiss, holding that WWP's claims for relief were not

19   subject to judicial review under the Administrative Procedures Act ("APA"), and in the

20   alternative, that Section 325 of the Department of the Interior and Related Agencies

21   Appropriation Act of 2004 barred WWP's claims relating to the BLM's renewal of

22   grazing permits.  (Dkt. #38).  Then, on February 16, 2009, WWP filed a motion to alter or

23   amend judgment pursuant to Fed.R.Civ.P. 59(e)), asking the Court to reconsider its

24   holding that WWP's claims for relief are not subject to judicial review under the APA;

25   reconsideration was not sought on the Court's alternative holding.  (Dkt. #40).  After

26   reviewing WWP's motion, the Court ordered the BLM to respond pursuant to L.R.Civ.

27   / / /

28

1   7.2(g)(2), which it did, asking the Court to deny WWP's motion.  (Dkt. #49).  In addition,

2   two amicus curiae parties filed briefs in support of WWP's motion.  (Dkt. #s 47, 51, 61).[1]

3        On May 13, 2009, the Court held oral argument on WWP's motion to alter or

4   amend the Court's February 2, 2009 order.  (Dkt. #63).  After the parties and amici

5   presented their arguments, the Court granted in part WWP's motion, reopening the case,

6   vacating its February 2, 2009 order, and reinstating the BLM's amended motion to

7   dismiss and related pleadings.  (Id.).  The Court now issues a new order in light of the

8   parties' and amici's further briefing on the issue of whether agency action or inaction

9   taken pursuant to presidential proclamations issued under the Antiquities Act are subject

10   to judicial review under the APA.

11   **II.   BACKGROUND**

12        **A.   Sonoran Desert National Monument**

13        On January 17, 2001, President William Jefferson Clinton established the Sonoran

14   Desert National Monument by signing Proclamation No. 7397, 66 Fed. Reg. 7354 (Jan.

15   22, 2001), under the authority of Section 2 of the Antiquities Act of 1906, 16 U.S.C. §

16   431.  (Amend. Compl., Ex. 1 to Rule Decl.).  The Monument is located approximately 60

17   miles southwest of Phoenix, Arizona and encompasses 496,377 acres of "untrammeled

18   Sonoran desert landscape."  (Id., ¶¶ 15-16, 20).  The Monument was created to preserve

19   and protect the functioning Sonoran desert ecosystem and diverse array of biological,

20   scientific, and historic resources located within the Monument.  (Id., Ex. 1 to Rule Decl.).

21        Proclamation No. 7397 states that the Secretary of the Interior must manage the

22   Monument through the BLM to implement the purposes of the Proclamation and prepare

23   a management plan that addresses the actions necessary to protect the objects identified in

24

25       [1]The instant order does not specifically cite to the pleadings filed in connection with

26   WWP's motion to alter or amend judgment, nor does it distinguish between the arguments

27   presented by WWP and the amici.  Regardless, the instant order considers and attempts to

28   address the relevant arguments presented by the parties and amici in their respective

pleadings.

1   the Proclamation.  66 Fed. Reg. at 7356.  The Proclamation also prohibits the BLM from

2   renewing grazing permits on Federal lands within the Monument south of Interstate

3   Highway 8, and provides that grazing north of Interstate 8 may be continued only to the

4   extent that the BLM determines it is compatible with the purpose of protecting the objects

5   identified in the Proclamation.  Id.

6          Pursuant to the Proclamation, the BLM has closed most of the grazing allotments

7   within the Monument south of Interstate 8; the remaining allotment was set to close on

8   February 29, 2009.  (Amend. Compl., ¶ 34).  However, to date, the BLM has not

9   completed a management plan for the Monument or made a determination as to whether

10  grazing within the Monument north of Interstate 8 is compatible with protecting the

11  Monument's natural and historic resources.  (Id., ¶¶ 65, 69).  In addition to failing to

12  prepare a management plan or issue a grazing compatibility determination, the BLM has

13  renewed grazing permits for five allotments in the northern portion of the Monument and

14  continues to annually authorize grazing on these allotments, as well as on a sixth

15  allotment whose permit was set to expire on February 28, 2009.  (Dkt. #25, p.5, Exhs.

16  1A-E).

17         **B.   1998-2004 Congressional Appropriations Riders**

18         In 1997, the Interior Board of Land Appeals decided that the BLM must prepare

19  site-specific environmental analyses prior to authorizing grazing on allotments within

20  Federal lands.  National Wildlife Federation v. BLM, 140 IBLA 85 (1997).  That ruling,

21  along with a spike in grazing permit expirations (and subsequent changes to the BLM's

22  policies for the renewal of such permits), resulted in a backlog of permit renewals.  (Dkt.

23  #25-2, p.3).  As a result, starting in 1998, Congress began passing legislation in the form

24  of yearly appropriations riders, which directed the BLM to renew, with the same terms

25  and conditions, all grazing permits set to expire during the following fiscal year until the

26  BLM completed processing of the permits in compliance with all applicable laws and

27  regulations.  Omnibus Consol. & Emergency Supplemental Appropriations Act, 1999,

28  Pub. L. No. 105-277, § 124, 112 Stat. 2681, 2681-261 (1998); Consol. Appropriations

1   Act, 2000, Pub. L. No. 106-112, § 123, 113 Stat. 1501, 1501A-159-60 (1999); Dep't of

2   the Interior & Related Agencies Appropriations Act, 2001, Pub. L. No. 106-291, § 116,

3   114 Stat. 922, 943 (2000); Dep't of the Interior & Related Agencies Appropriations Act,

4   2002, Pub. L. No. 107-63, § 114, 115 Stat. 414, 438-39 (2001); Consol. Appropriations

5   Resol., 2003, Pub. L. No. 108-7, § 328, 117 Stat. 11, 276-77 (2003).

6         Most recently, on November 10, 2003, Congress passed the Department of the

7   Interior and Related Agencies Appropriations Act, 2004, which likewise directs the BLM

8   to renew all grazing permits set to expire during fiscal years 2004-2008, with the same

9   terms and conditions, until the BLM completes processing of the permits in compliance

10   with all applicable laws and regulations.  See Pub. L. No. 108-108, § 325, 117 Stat. 1241,

11   1308 (2004).

12   **III.   LEGAL STANDARD**

13         The BLM moves to dismiss WWP's Amended Complaint for lack of subject

14   matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), or in the alternative, for failure to

15   state a claim upon which relief may be granted pursuant to Fed.R.Civ.P. 12(b)(6).  (Dkt.

16   #25-2, p.5).

17         When a party moves to dismiss a complaint for lack of subject matter jurisdiction

18   pursuant to Fed.R.Civ.P. 12(b)(1), that party bears the burden of proof that the court has

19   jurisdiction to decide the claim(s).  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S.

20   375, 377 (1994) ("It is to be presumed that a cause lies outside [the court's] limited

21   jurisdiction, [ ] and the burden of establishing the contrary rests upon the party asserting

22   jurisdiction."); see also Thornhill Publ'n v. General Tel. & Elecs. Corp., 594 F.2d 730,

23   733 (9th Cir. 1979).

24         On the other hand, "[t]he motion to dismiss for failure to state a claim is viewed

25   with disfavor and is rarely granted."  Gilligan v. Jamco Development Corp., 108 F.3d

26   246, 249 (9th Cir. 1997).  To survive a motion to dismiss for failure to state a claim, the

27   plaintiff must simply allege facts sufficient "to raise a right to relief above the speculative

28   level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007); see also

1   Morley v. Walker, 175 F.3d 756, 759 (9th Cir. 1999) ("A dismissal for failure to state a

2   claim is appropriate only where it appears, beyond doubt, that the plaintiff can prove no

3   set of facts that would entitle it to relief.").

4        In evaluating a motion to dismiss, "all well-pleaded allegations of material fact are

5   taken as true and construed in a light most favorable to the nonmoving party." Wyler

6   Summit Partnership v. Turner Broad. Sys. Inc., 135 F.3d 658, 661 (9th Cir. 1998).

7   However, "the court [is not] required to accept as true allegations that are merely

8   conclusory, unwarranted deductions of fact, or unreasonable inferences." Sprewell v.

9   Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001).  Likewise, "a formulaic

10  recitation of the elements of a cause of action will not do." Twombly, 127 S. Ct. at 1965.

11       A district court need not limit itself to the allegations in the complaint, and may

12  take into account "facts that are [ ] alleged on the face of the complaint [and] contained in

13  documents attached to the complaint." Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir.

14  2005).  In addition, "a district court [may] consider documents 'whose contents are

15  alleged in a complaint and whose authenticity no party questions, but which are not

16  physically attached to the [plaintiff's] pleading.'" In re Silicon Graphics Inc. Sec. Litig.,

17  183 F.3d 970, 986 (9th Cir. 2002) (quoting Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir.

18  1994)).  Moreover, "[f]or motions to dismiss under Rule 12(b)(1), unlike a motion under

19  Rule 12(b)(6), the moving party may submit affidavits or any other evidence properly

20  before the court . . . .  It then becomes necessary for the party opposing the motion to

21  present affidavits or any other evidence necessary to satisfy its burden of establishing that

22  the court, in fact, possesses subject matter jurisdiction." Ass'n of Am. Med. Colleges v.

23  United States, 217 F.3d 770, 778-79 (9th Cir. 2000); White v. Lee, 227 F.3d 1214, 1242

24  (9th Cir. 2000) ("With a factual Rule 12(b)(1) attack, [ ] a court may look beyond the

25  complaint to matters of public record without having to convert the motion into one for

26  summary judgment.").

27  / / /

28

1   **IV.    DISCUSSION**

2          **A.  The Antiquities Act**

3          The Antiquities Act authorizes the President of the United States,
           in his discretion, to declare by public proclamation historic landmarks . . .
4          and other objects of historic and scientific interest that are situated upon
           lands owned or controlled by the Government of the United States to be
5          national monuments, and may reserve as a part thereof parcels of land, the
           limits of which in all cases shall be confined to the smallest area compatible
6          with the proper care and management of the objects to be protected.

7   16 U.S.C. § 431.  "Since its enactment, presidents have used the Antiquities Act more

8   than 100 times to withdraw lands from the public domain as national monuments." Utah

9   Ass'n of Counties v. Bush, 316 F. Supp.2d 1172, 1177-78 (D. Utah 2004).

10         Courts are severely limited in their review of such congressionally authorized

11  presidential actions:

12         It has long been held that where Congress has authorized a public officer to
           take some specified legislative action[,] when in his judgment that action is
13         necessary or appropriate to carry out the policy of Congress, the judgment
           of the officer as to the existence of the facts calling for that action is not
14         subject to review.

15  United States v. George S. Bush & Co., 310 U.S. 371 (1940) (internal citations omitted).

16  Thus, while courts can evaluate whether the President exercises his discretion in

17  accordance with the standards set forth in the Antiquities Act, courts cannot review the

18  President's determinations and factual findings.  See Mountain States Legal Found. v.

19  Bush, 306 F.3d 1132, 1136 (D.C. Cir. 2002) ("Although the Supreme Court has never

20  expressly discussed the scope of judicial review under the Antiquities Act, . . . . [t]he

21  Court has highlighted the separation of powers concerns that inhere in such circumstances

22  and has cautioned that these concerns bar review for abuse of discretion altogether."); see

23  also Alaska v. Carter, 462 F. Supp. 1155, 1160 (D. Alaska 1978) ("[T]he President is not

24  subject to the impact statement requirement of [the National Environmental Policy Act]

25  when exercising his power to proclaim national monuments under the Antiquities Act.").

26         **B.  Judicial Review of Agency Action Taken Pursuant to Presidential
                Proclamations**

27

28

- 7 -

1    WWP asserts two claims for relief in its complaint:  (1) violation of the Sonoran

2  Desert National Monument Proclamation for failure to complete a compatibility

3  determination and management plan, and (2) violation of the Sonoran Desert National

4  Monument Proclamation for reauthorizing grazing prior to conducting a compatibility

5  determination.  (Amend. Compl., ¶¶ 71-79).  Both claims are brought under the judicial

6  review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  The

7  BLM moves to dismiss WWP's Amended Complaint under Fed.R.Civ.P. 12(b)(1) for

8  lack of subject matter jurisdiction, asserting that "the APA does not allow for judicial

9  review of Presidential actions."  (Dkt. #34, p.7).  WWP, however, contends that it is not

10  challenging "action by the President, such as the monument proclamation itself," but

11  "BLM's failure to complete the mandatory compatibility determination and management

12  plan" as directed in Proclamation No. 7397.  (Dkt. #32, pp. 12-13).  In other words, WWP

13  seeks APA review of the BLM's failure to act in accordance with the management

14  directives contained in Proclamation No. 7397, i.e., make a compatibility determination

15  and prepare a management plan.

16        i. The APA

17    The Administrative Procedures Act ("APA") provides for judicial review of

18  agency action.  See 5 U.S.C. § 702 ("A person suffering legal wrong because of agency

19  action, or adversely affected or aggrieved by agency action within the meaning of a

20  relevant statute, is entitled to judicial review.").  Indeed, "the APA establishes a *strong

21  presumption in favor of reviewability* of agency action."  McAlpine v. United States, 112

22  F.3d 1429, 1432 (10th Cir. 1997) (emphasis in original); see Heckler v. Chaney, 470 U.S.

23  821, 843 (1985) (Marshall, J., concurring).

24    A court has subject matter jurisdiction to review agency action under the APA

25  where the claims for relief "identify some [particular] agency action" and "the agency

26  action in question [is a] final agency action."  Lujan v. National Wildlife Fed'n., 497 U.S.

27  871, 882 (1990) (internal quotation marks omitted); 5 U.S.C. § 704 ("Agency action made

28

1  reviewable by statute and final agency action for which there is no other adequate remedy
2  in a court are subject to judicial review.").

3        "[A]n agency's action is not necessarily final merely because it is binding."
4  Appalachian Power Co. v. E.P.A., 208 F.3d 1015, 1022 (D.C. Cir. 2000).  "As a general
5  matter, two conditions must be satisfied for agency action to be 'final': First, the action
6  must mark the 'consummation' of the agency's decisionmaking process, . . . it must not
7  be of a merely tentative or interlocutory nature.  And second, the action must be one by
8  which 'rights or obligations have been determined,' or from which 'legal consequences
9  will flow.'"  Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (internal citations omitted).

10        An agency action, of course, "includes the whole or a part of any agency rule,
11  order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5
12  U.S.C. § 551(13); see Norton v. Southern Utah Wilderness Alliance ("SUWA"), 542 U.S.
13  55, 63 (2004) ("Sections 702, 704, and 706(1) all insist upon an 'agency action,' either as
14  the action complained of (in §§ 702 and 704) or as the action to be compelled (in §
15  706(1)).").  Therefore, "a claim [for failure to act] under § 706(1) can proceed [ ] where a
16  plaintiff asserts that an agency failed to take a discrete agency action that it is required to
17  take."  Id. at 64.

18                 ii. The APA & Presidential Proclamations

19        It is well settled that the Administrative Procedures Act does not apply to
20  presidential action.  Dalton v. Specter, 511 U.S. 462, 469 (1994) ("[T]he President's
21  actions [are] not reviewable under the APA, because the President is not an 'agency'
22  within the meaning of the APA."); Franklin v. Massachusetts, 505 U.S. 788, 800-01
23  (1992) (President is not an "agency" within the meaning of the APA).  But see Public
24  Citizen v. U.S. Trade Representative, 5 F.3d 549, 552 (D.C. Cir. 1993) ("Franklin is
25  limited to those cases in which the President has final constitutional or statutory
26  responsibility for the final step necessary for the agency action directly to affect the
27  parties.").  It is also well settled that courts may engage in ultra vires review of
28  presidential proclamations that designate federal lands as national monuments to ensure

1   that the President properly exercised his or her delegated authority under the Antiquities

2   Act.  See, e.g., Mountain States Legal Found., 306 F.3d at 1136 ("In reviewing challenges

3   under the Antiquities Act, the Supreme Court has indicated generally that review is

4   available to ensure that the Proclamations are consistent with constitutional principles and

5   that the President has not exceeded his statutory authority.") (citations omitted).  In

6   addition, the Court notes that the parties do not dispute that the President may impose

7   restrictions or directives on the management of federal land in monument proclamations

8   (just as the President may impose directives on agencies through executive orders).  (Dkt.

9   #49, p.7).

10      In Tulare County v. Bush, 185 F. Supp. 2d 18, 28 (D.D.C. 2001), the plaintiff

11  sought relief under the APA, alleging that the Forest Service's management of the Giant

12  Sequoia National Monument violated both the National Environmental Policy Act of

13  1969 ("NEPA"), 42 U.S.C. § 4321 et seq., and the National Forest Management Act of

14  1976 ("NFMA"), 16 U.S.C. §§ 1600-14.  The district court held that judicial review was

15  unavailable under the APA "because the [agency] is merely carrying out directives of the

16  President, and the APA does not apply to presidential action."  Id.  The court reasoned

17  that:

18      Any argument suggesting that this action is agency action would suggest
        the absurd notion that all presidential actions must be carried out by the
19      President him or herself in order to receive the deference Congress has
        chosen to give presidential action.  The court refuses to give the term
20      "presidential action" such a confusing and illogical interpretation.

21  Id. at 28-29.  On appeal, the D.C. Circuit affirmed the district court's dismissal, but did so

22  for failure to state a claim under Fed.R.Civ.P. 12(b)(6) rather than lack of subject matter

23  jurisdiction under Fed.R.Civ.P. 12(b)(1).  Tulare County v. Bush, 306 F.3d 1138, 1143

24  (D.C. Cir. 2002) ("Although Tulare County refers to the existence of foresters on the

25  ground, the complaint does not identify these foresters' acts with sufficient specificity to

26  state a claim."); see also Zurich Ins. Co. v. Amcor Sunclipse North America, 241 F.3d

27  605, 608 (7th Cir. 2001) ("The district court's opinion . . . has negligible authority . . .

28  because the court of appeals went out of its way to . . . decide[ ] the appeal on other

- 10 -

1    grounds . . .”); R.C.M. Executive Gallery Corp. v. Rols Capitol Co., 901 F. Supp. 630,

2    637 (S.D.N.Y. 1995).  With respect to the question of jurisdiction, the D.C. Circuit noted

3    that “Presidential actions, of course, are not subject to APA review,” but then indicated

4    that Tulare County might have, had it stated its claim with sufficient specificity,

5    “overcome this bar by challenging the non-presidential actions of the Forest Service,

6    referring to two Forest Service documents – an internal Forest Service memorandum

7    interpreting the Proclamation and an interim plan that directs the day-to-day management

8    of the Monument – allegedly showing that the Service is not acting consistently with the

9    Proclamation.”  Id.

10           In Tulare County, however, the plaintiff sought judicial review of its claims that

11   the U.S. Forest Service’s management plan for the Grand Sequoia National Monument

12   *violated NEPA and NFMA*, not the presidential proclamation itself, because the Forest

13   Service’s management plan failed to comply with directives in the proclamation.  Id. at

14   1143; see also Kane County Utah v. Salazar, 562 F.3d 1077, 1082 (10th Cir. 2009)

15   (plaintiff’s claim under the APA sought declaration that agency action violated FLPMA,

16   not the monument proclamation).  As the D.C. Circuit noted, review of agency action or

17   inaction is routinely available when the *underlying statutes*, such as NEPA or NFMA,

18   contain no private right of action.  Tulare County, 306 F.3d at 1143 (“Neither NFMA nor

19   NEPA provides a cause of action, so the claims must be brought under the [APA].”); see,

20   e.g., Chrysler Corp. v. Brown, 441 U.S. 281, 317-19 (1979) (it is not necessary to find a

21   private right of action under a particular statute in order to enforce a federal agency’s

22   compliance with that statute under the APA); Native Ecosystems Council v. U.S. Forest

23   Service, 428 F.3d 1233, 1238 (9th Cir. 2005) (“Because NFMA and NEPA do not

24   provide a private cause of action to enforce their provisions, agency decisions allegedly

25   violating NFMA and NEPA are reviewed under the Administrative Procedure Act.”);

26   Oregon Natural Resources Council Fund v. Brong, 492 F.3d 1120, 1124 (9th Cir. 2007)

27   (agency action that allegedly violates the Federal Land Policy and Management Act of

28   1976 (“FLPMA”), 43 U.S.C. § 1701 *et seq.*, is reviewed under the APA).  That, however,

1   is not the issue here.  In this case, WWP seeks judicial review under the APA of claims

2   that the BLM's failure to act in accordance with Proclamation No. 7397's directives to

3   the BLM to make a grazing compatibility determination and prepare a management plan

4   for the Sonoran Desert National Monument *violates the monument proclamation itself*.[2]

5                    iii. Two Possible Avenues of Review

6            In certain circumstances, judicial review is available under the Administrative

7   Procedures Act to challenge final agency action or inaction that allegedly violates

8   executive orders and presidential proclamations.[3]  Specifically, in City of Carmel-By-

9   The-Sea v. U.S. Dept. of Transp., the Ninth Circuit held that "[u]nder certain

10  circumstances, Executive Orders, with specific statutory foundation, are treated as agency

11  action and reviewed under the Administrative Procedure Act."  123 F.3d 1142, 1166 (9th

12  Cir. 1997); see City of Albuquerque v. U.S. Dept. Of Interior, 379 F.3d 901, 913 (10th

13  Cir. 2004) ("If an executive order has a specific statutory foundation it is given the effect

14  of a congressional statute."); Indep. Meat Packers Ass'ns v. Butz, 526 F.2d 228, 234 (8th

15  _____

16          [2]The Court emphasizes that this is a unique case; it is one of first impression.  The
17  Court has discovered no case in which the plaintiff's claims for relief were asserted solely
    under a presidential proclamation, as opposed to statutes that imposed independent statutory
18  obligations on agencies.  The only other case in which the plaintiff asserted a claim for relief
    directly under a proclamation appears to be California ex rel. Lockyer v. U.S. Forest Service,
19  465 F. Supp. 2d 917 (N.D. Cal. 2006).  However, there, the district court explicitly declined
20  to  consider the plaintiff's "purported[ ] claim under the [APA], alleging that '[t]he Forest
    Service's failure to comply with the Proclamation constitutes arbitrary and capricious agency
21  action," as the plaintiff had also asserted a claim under NEPA; "the Court will address these
22  arguments only under NEPA."  Id. at 923 n. 2.

23          [3]For purposes of judicial review under the APA, WWP assumes that proclamations
    and executive orders are functionally equivalent.  Indep. Meat Packers Ass'ns v. Butz, 526
24  F.2d 228, 234 (8th Cir. 1975) ("Presidential proclamations and [executive] orders have the
    force and effect of laws when issued pursuant to a statutory mandate or delegation of
25  authority from Congress.") (citations omitted).  The BLM does not contest this issue.  Indeed,
26  both presidential proclamations and executive orders can be issued pursuant to the
    President's congressionally delegated authority, compare Executive Order No. 12072 with
27  Proclamation No. 7397, or pursuant to the President's authority under the Constitution and
28  laws of the United States, compare Executive Order No. 11988 with Proclamation No. 5030.

1   Cir. 1975) (same).  The Ninth Circuit defines those "certain circumstances" as executive

2   orders that set objective standards and do not preclude judicial review.  City of Carmel-

3   By-The-Sea, 123 F.3d at 1166 ("The Executive Orders here do not preclude judicial

4   review and there is 'law to apply,' as these Executive Orders set objective standards.").

5            There appear to be two ways in which agency action taken pursuant to an

6   executive order or presidential proclamation may be subject to judicial review under the

7   APA: (1) where Congress explicitly delegates authority to the President to issue directives

8   to an agency, or (2) where the agency directives in a presidential order or proclamation

9   "rest upon statute," i.e., the directives are issued in accordance with or in furtherance of

10  agency action that is specifically authorized or required by statute.  LASAC, 608 F.2d at

11  1330 n. 15.  Compare City of Albuquerque, 379 F.3d at 913-14 (agency action taken

12  pursuant to Executive Order No. 12072 was subject to judicial review under the APA

13  because Congress specifically delegated to the President the authority to "prescribe such

14  policies and directives" pursuant to the Federal Property and Administrative Services Act

15  of 1949 ("FPASA"), as amended, 40 U.S.C. § 486(a)) with City of Carmel-By-The-Sea,

16  123 F.3d at 1166 (agency compliance with Executive Orders No. 11988 and 11990 were

17  subject to judicial review under the APA because the executive orders rested on, i.e., were

18  issued in furtherance of, among other statutes, the National Environmental Policy Act of

19  1969 ("NEPA"), as amended, 42 U.S.C. § 4321 et seq., which required the Federal

20  Highway Administration to issue an environmental impact statement despite the fact that

21  NEPA, unlike FPASA, does not specifically delegate to the President the authority to

22  issue directives concerning agency action).  WWP argues that presidential proclamations

23  issued pursuant to the authority delegated to the President under the Antiquities Act, and

24  any management directives contained therein, are subject to judicial review under the

25  APA.  In other words, according to WWP, the Antiquities Act specifically delegates to

26  the President the authority to issue directives in monument proclamations and thus

27

28

1   provides the specific statutory foundation necessary for a proclamation's directives to be

2   "given the effect of a congressional statute."[4]   City of Albuquerque, 379 F.3d at 913.

3          The Antiquities Act constitutes an express, broad delegation of authority to the

4   President.  See Mountain States Legal Foundation, 306 F.3d at 1135 ("The Supreme

5   Court has considered the Antiquities Act in three cases, each time confirming the broad

6   power delegated to the President under the Act.") (citations omitted); California, 436 U.S.

7   at 36 (holding that whether federal lands are included within a national monument raises

8   "a question only of Presidential intent, not of Presidential power"); Cappaert v. United

9   States, 426 U.S. 128, 141-42 (1976) (rejecting the plaintiff's claim that the President may

10  use the Antiquities Act "only to protect archeological resources"; holding instead that the

11  Act, by also authorizing the President to proclaim as national monuments "objects of

12  historic or scientific interest," authorized the President to reserve as part of the monument

13  "[t]he [underground] pool in Devil's Hole and its rare inhabitants").  "The Antiquities Act

14  of 1906 permits the President, 'in his discretion,' to create a national monument and

15  reserve land for its use simply by issuing a proclamation with respect to land 'owned or

16  controlled by the Government of the United States.'"   United States v. California, 436

17  U.S. 32, 40 (1978) (quoting 16 U.S.C. § 431 (1976 ed.)).  The only limitation placed on

18  the President's authority to reserve federal land for the creation of national monuments by

19

20          [4]The BLM does not appear to contest WWP's assertion that a proclamation's

21  directives are a valid exercise of the President's broad discretion under the Antiquities Act.

    However, the BLM contends that its failure to comply with Proclamation No. 7397's

22  directives are not subject to judicial review because the agency action that WWP challenges

23  are agency actions taken (or not taken) pursuant to directives issued in the proclamation

    itself; the BLM does not have any statutory obligation to act. But per City of Albuquerque,

24  379 F.3d at 913, if a proclamation's directives are in fact issued pursuant to authority

25  delegated to the President under the Antiquities Act, then the directives would presumably

    be given the effect of a congressional statute, requiring agency action.  And when an agency

26  fails to comply with a statutory obligation, judicial review of that final agency action or

27  inaction is generally available under the APA.  See SUWA, 542 U.S. at 64 ("[A] claim under

    § 706(1) can proceed [ ] where a plaintiff asserts that an agency failed to take a discrete

28  agency action that it is required to take.").

1   the Antiquities Act is that the "parcels of land" reserved must "be confined to the smallest

2   area compatible with the proper care and management of the objects to be protected."  16

3   U.S.C. § 431; see generally Mountain States Legal Foundation, 306 F.3d at 1135-37;

4   Mark Squillace, The Monumental Legacy of the Antiquities Act of 1906, 37 Ga. L. Rev.

5   473 (2003).

6       In addition, it has become widespread practice for the President to issue

7   restrictions on the use and management of the federal lands reserved for the creation of

8   national monuments.  See, e.g., Proclamation No. 1313, 39 Stat. 1752 (1915);

9   Proclamation No. 1608, 42 Stat. 2249 (1921); Proclamation No. 1664, 43 Stat. 1913

10  (1923); Proclamation No. 2246, 50 Stat. 1856 (1937); Proclamation No. 3467, 76 Stat.

11  1465 (1962); Proclamation No. 4619, 93 Stat. 1460 (1978); Proclamation No. 7295, 3

12  C.F.R. 60 (2001); Proclamation No. 7397, 66 Fed. Reg. 7354 (2001); Proclamation 8031,

13  71 Fed. Reg. 36443, 36444 (2006), as amended by 72 Fed. Reg. 10031 (2007).  WWP

14  argues that the Antiquities Act authorizes the President to issue such restrictions and

15  directives.  In addition, the President's "long-continued practice, known to and

16  acquiesced in by Congress" of issuing management directives in proclamations issued

17  pursuant to the Antiquities Act, arguably "raise[s] a presumption that the [action] had

18  been [taken] in pursuance of its consent . . . ."  United States v. Midwest Oil Co., 236

19  U.S. 459, 474 (1915); see also Dames & Moore v. Regan, 453 U.S. 654, 686 (1981);

20  AFL-CIO v. Kahn, 618 F.2d 784, 790 (D.C. Cir. 1979) ("[T]he President's view of his

21  own authority under a statute is not controlling, but when that view has been acted upon

22  over a substantial period of time without eliciting Congressional reversal, it is entitled to

23  great respect.") (internal quotation marks omitted).

24      However, where the authorizing statute or another statute does not place

25  discernible limits on the President's discretion to issue directives to agencies, judicial

26  review of agency action taken pursuant to those directives is generally unavailable.  See

27  Dalton, 511 U.S. at 474 ("[APA] review is not available when the statute commits the

28  decision to the discretion of the President."); see Mountain States Legal Found., 306 F.3d

1   at 1136 ("A somewhat different case is presented, however, where the authorizing statute
2   or another statute places discernible limits on the President's discretion.").  See generally
3   Mistretta v. United States, 488 U.S. 361, 655 ("So long as Congress shall lay down by
4   legislative act an intelligible principle to which the person or body authorized to exercise
5   the delegated authority is directed to conform, such legislative action is not a forbidden
6   delegation of legislative power.") (internal quotation marks and alternations omitted).
7   But the Antiquities Act does not appear to place limits on the President's apparent
8   discretion to issue directives concerning the management of federal land reserved under
9   the Act; it merely mentions the "proper care and management of the objects to be
10  protected" in the context of limiting the President's authority to reserve land under the
11  Act.  See California, 436 U.S. at 40 ("A reservation under the Antiquities Act [ ] means
12  no more than that the land is shifted from one federal use, and perhaps from one federal
13  managing agency, to another.").  Then again, subsequent statutes concerning the use and
14  management of federal land, including FLPMA, NFMA, the Taylor Grazing Act of 1934,
15  43 U.S.C. § 315, NEPA, the Endangered Species Act of 1973, 16 U.S.C. §§ 1531 et seq.,
16  and the Public Rangelands Improvement Act of 1978, 43 U.S.C. §§ 1901-1908, do appear
17  to place discernible limits on the President's apparent discretion to issue directives in
18  proclamations for the use and management of federal land in national monuments created
19  pursuant to the Antiquities Act.

20           WWP cites to California ex rel. Lockyer, 465 F. Supp. 2d 917, for the proposition
21  that agency action or inaction taken pursuant to directives in a proclamation is necessarily
22  subject to judicial review under the APA when the proclamation is issued pursuant to the
23  Antiquities Act.  But in that case, although the plaintiff brought a claim under the APA
24  that the U.S. Forest Service failed to comply with directives contained within the Grand
25  Sequoia National Monument Proclamation, the district court explicitly declined to decide
26  whether such a claim was directly subject to review under the APA.  Id. at 923 n. 2
27  ("[T]he Court will address these arguments only under NEPA."); see also Tulare County,
28  306 F.3d at 1143 (APA review was available for NEPA and NFMA claims to ensure

1    agency action complied with directives in monument proclamation); Sierra Club v.

2    Bosworth, 465 F. Supp. 2d 931, 935 (N.D. Cal. 2005) (subjecting *NEPA claim* to APA

3    review and addressing agency's compliance with proclamation's directives).  The court

4    specifically held that "the Forest Service failed to comply *with NEPA* in preparing a

5    management plan for the Grand Sequoia National Monument as required by the

6    Presidential Proclamation."  California ex rel. Lockyer, 465 F. Supp. 2d at 931 (emphasis

7    added).

8         Thus, it appears that in California ex rel. Lockyer, it was NEPA, not the

9    proclamation, that provided the statutory hook to subject agency action or inaction to

10   judicial review under the APA, whereas here WWP does not similarly claim that the

11   BLM violated a specific statute, such as FLPMA, but Proclamation No. 7397 itself.

12   WWP believes that distinction is irrelevant, or at the very least unpersuasive, arguing as

13   such: the proclamation requires agency action; the proclamation was issued pursuant to

14   the Antiquities Act which delegates to the President the authority to issue directives to

15   agencies; the proclamation is thus given the effect of a congressional statute requiring

16   agency action, and so final agency action or inaction pursuant to those directives are

17   subject to judicial review under the APA.  In other words, WWP argues that the court in

18   California ex rel. Lockyer was able to enforce compliance with the proclamation's

19   directives only because the proclamation carried the force and effect of law, i.e., was

20   given the effect of a congressional statute; so the court could have held that the agency

21   failed to comply with the proclamation itself rather than NEPA.  That argument appears

22   to be sound to the extent that the Antiquities Act does in fact delegate to the President the

23   authority to issue directives to agencies in proclamations and the directives are thus given

24   the effect of a congressional statute.

25        The court, however, need not determine that issue as an executive order or

26   presidential proclamation may also be subject to judicial review under the APA and

27   treated as agency action when the order or proclamation "rests upon statute."  See, e.g.,

28   LASAC, 608 F.2d at 1330 n. 15.  Executive orders directing the actions of agencies are

1    generally issued by the President in accordance with his or her authority under "the

2    Constitution and statutes of the United States of America."  <u>See, e.g.</u>, Exec. Order No.

3    11990, 42 FR 26961 (1977); Exec. Order No. 11988, 42 FR 26951 (1977); Exec. Order

4    No. 11246, 30 FR 12319, 12935 (1965); <u>see also</u> <u>Utah Ass'n of Counties</u>, 316 F. Supp. 2d

5    at 1184 ("The use of executive orders may be employed by the President in carrying out

6    his constitutional obligation to see that the laws are faithfully executed and to delegate

7    certain of his duties to other executive branch officials, but an executive order cannot

8    impose legal requirements on the executive branch that are inconsistent with the express

9    will of Congress.").  In the absence of an express delegation of authority to the President,

10   judicial review of agency action taken pursuant to an executive order is available under

11   the APA as long as the order directs an agency to take action in furtherance of the

12   agency's independent statutory obligation.  Similarly, analogizing an executive order

13   directing agency action to agency directives in a presidential proclamation, judicial

14   review of agency action or inaction taken pursuant to a proclamation's directives is

15   available under the APA as long as the directives are issued in furtherance of the agency's

16   independent statutory obligation.

17        The BLM is authorized to manage federal lands under, among other statutes,

18   FLPMA.  FLPMA requires the BLM, among other things, to "develop, maintain, and,

19   when appropriate, revise land use plans."  43 U.S.C. § 1712(a); <u>see</u> <u>Oregon Natural</u>

20   <u>Resources Council Fund</u>, 492 F.3d at 1125 ("The process for developing, maintaining,

21   and revising resource management plans is controlled by federal regulations at 43 C.F.R.

22   §§ 1601.0-1610.8 (2006)."); <u>see also</u> 43 U.S.C. § 1701(b) ("The policies of this Act shall

23   become effective only as *specific statutory authority* for their implementation is [sic]

24   enacted by this Act or subsequent legislation . . .") (emphasis added).  In addition, the

25   BLM manages grazing on federal land in accordance with FLPMA, the Taylor Grazing

26   Act of 1934, 43 U.S.C. § 315, NEPA, the Endangered Species Act of 1973, 16 U.S.C. §§

27   1531 *et seq.*, and the Public Rangelands Improvement Act of 1978, 43 U.S.C. §§ 1901-

28   1908.  These statutes, and in particular FLMPA, appear to constitute the "specific

1    statutory foundation" or independent statutory obligation for the BLM to manage federal

2    land, and specifically here, the enabling statute for the BLM to comply with Proclamation

3    No. 7397's directives to make a grazing compatibility determination and prepare a

4    management plan for the Sonoran Desert National Monument.  Therefore, if a monument

5    proclamation directing certain agency action is issued in furtherance of an agency's

6    existing statutory obligation for related agency action (FLPMA for directives concerning

7    management plans; FLMPA and the Taylor Grazing Act, among others, for grazing

8    compatibility determinations), then agency action or inaction in violation of the

9    proclamation is subject to judicial review under the APA; the directives must be

10   sufficiently related to the agency's grant of authority from Congress to have the force of

11   law.  See LASAC, 608 F.2d at 1330 n. 14.

12        In City of Carmel-By-The-Sea, the Ninth Circuit held that both Executive Order

13   11990 and 11988 were subject to judicial review under the APA; both orders issued

14   directives "in furtherance of," among other statutes, NEPA.  123 F.3d at 1166-67.  Thus,

15   NEPA and the other listed statutes provided the "specific statutory foundation" to subject

16   the agency action taken pursuant to the Executive Orders' directives to judicial review

17   under the APA.  See also Southern Utah Wilderness Alliance v. Sierra, 2008 WL

18   4643003, at *3 n. 3 (D. Utah 2008) (holding that Executive Orders 11644 and 11989

19   "may be enforced under the APA because . . . they have specific statutory foundation";

20   both orders were issued "in furtherance of" NEPA).  In addition, in LASAC, the Ninth

21   Circuit held that provisions of Executive Order No. 11246 were subject to judicial review

22   under the APA because, among other things (e.g., subsequent congressional ratification of

23   the essential features of the order), the provisions were "sufficiently rooted in a grant of

24   authority from Congress to have the force of law"; "Executive Order 11246 rests upon

25   statutory and other congressional authorization."  608 F.2d at 1330 n. 14, n. 15.  Further,

26   in reviewing the President's authority to set aside federal land under the Antiquities Act,

27   the Supreme Court noted that the Devil's Hole National Monument Proclamation relied

28   on the National Park Service Act, 16 U.S.C. §§ 1-3, which specifically cites the statutory

1  authority for the Director of the National Park Service to manage federal land.  426 U.S.

2  128, 140-41 (1976) ("Also explicit in the 1952 Proclamation is the authority of the

3  Director of the Park Service to manage the lands of Devil's Hole Monument '*as* provided

4  in the act of Congress entitled 'An Act to establish a National Park Service' . . .'").[5]

5      Here, Proclamation No. 7397 declares certain objects of historic and scientific

6  interest to be the Sonoran Desert National Monument, and reserves as a part thereof,

7  certain federal land.  The Proclamation also directs the BLM to prepare a management

8  plan and conduct a grazing compatibility determination.  Those directives relate to the

9  management of federal land (now part of the SDNM); and the BLM's authority to

10  manage federal land is derived from, among other statutes, FLPMA.  As such, it appears

11  that Proclamation No. 7397's directives may be judicially enforceable if they rest on or

12  are issued in furtherance of FLPMA; if FLMPA constitutes the statutory foundation for

13  the agency action directed by the Proclamation.

14      Proclamation No. 7397's agency directives do not, however, explicitly refer to

15  FLPMA or other statutory authority.  The Proclamation merely states that its directives to

16  the BLM are issued "pursuant to applicable legal authorities."  Proc. No. 7397, 66 FR at

17  7356.  Nevertheless, since the directives are related to the BLM's management of federal

18  land, and the BLM manages federal land pursuant to FLPMA, the only reasonable

19  conclusion is that the directives are issued in furtherance of (or in accordance with)

20

---

21      [5]City of Albuquerque involved both delegated authority and congressional
22  authorization for related agency action.  There the Tenth Circuit held that Executive Order
   No. 12072's directives to the Administrator of General Services were subject to judicial
23  review because the order was issued under the "authority vested in [the] President of the
   United States of America by Section 205(a) of the [FPASA]," which specifically delegated
24  to the President the authority to "prescribe policies and directives that the President considers
   necessary to carry out [the FPASA]."  379 F.3d at 914.  The FPASA, however, also
25  authorized the Administrator to prescribe regulations to carry out the FPASA, and thus
26  constituted the specific statutory foundation or independent statutory obligation on which the
   directives in Executive Order 12072 could rely.  FPASA thus provided the foundation for
27  both the issuance and enforcement of the executive order and the directives contained
28  therein.

1   FLPMA; the directives rely on the BLM's independent statutory obligations under

2   FLPMA.  Thus, FLPMA appears to constitute the specific statutory foundation necessary

3   to supply APA review of Proclamation No. 7397's directives to the BLM to prepare a

4   monument plan and conduct a grazing compatibility determination.  See Farkas v. Texas

5   Instrument, Inc., 375 F.2d 629, 632 n. 1 (5th Cir. 1967) (although Exec. Order No. 10925

6   did not explicitly cite to the FPASA, the Fifth Circuit was "hesitant to say that the

7   antidiscrimination provisions of Exec. Order No. 10925 are so unrelated to [the FPASA]

8   that the order should be treated as issued without statutory authority."); but see Indep.

9   Meat Packers, 526 F.2d at 235-36 (holding that Exec. Order No. 11821 was not subject to

10  judicial review under the APA because it "cite[d] no specific source of authority other

11  than the 'Constitution and laws of the United States,'" and thus "was intended primarily

12  as a managerial tool for implementing the President's personal economic policies and not

13  as a legal framework enforceable by private civil action.").

14          Although there are times when a court may be unable to divine the statutory

15  foundation relied on by an executive order or proclamation's directives because the order

16  or directives fail to explicitly refer to the agency's independent statutory obligation on

17  which the order or directives rely, see Indep. Meat Packers, 526 F.2d at 235-36, to find

18  that here would result in holding Proclamation No. 7397's directives are not subject to

19  review under the APA because of a technicality.  That, the Court declines to do.  See, e.g.,

20  Heckler, 470 U.S. at 843 ("[T]he APA presumptively entitles any person 'adversely

21  affected or aggrieved by agency action,' 5 U.S.C. 702 - which is defined to include the

22  'failure to act,' 5 U.S.C. 551 (13) - to judicial review of that action.") (Marshall, J.,

23  concurring); McAlpine, 112 F.3d at 1432 ("[T]he APA establishes a *strong presumption*

24  *in favor of reviewability* of agency action.") (emphasis in original).  Therefore, as the

25  directives in Proclamation No. 7397 rely on "all applicable legal authorities," which in

26  the context the BLM' management of federal land necessarily refers to the BLM's

27  independent statutory obligation under FLPMA, the Court concludes that Proclamation

28  No. 7397's directives rely on specific statutory authority sufficient to subject agency

1  action or inaction taken in accordance with those directives to judicial review under the

2  APA.

3         In addition, Proclamation No. 7397 contains "law to apply."  See City of Carmel-

4  By-The-Sea, 123 F.3d at 1166.  "[J]udicial review [is] limited to the non-discretionary

5  aspects of agency action."  LASAC, 608 F.2d at 1330; City of Albuquerque, 379 F.3d at

6  916-17.  Thus, to be subject to judicial review, a proclamation's directives must "identify

7  in clear mandatory terms" the agency action that must be taken.  Id.  Here, Proclamation

8  No. 7397's directives are explicit: 1) "all motorized and mechanized vehicle use off road

9  will be prohibited, except for emergency or authorized administrative purposes"; 2) "the

10  Secretary of the Interior shall prepare a management plan that addresses the actions,

11  including road closures or travel restrictions, necessary to protect the objects identified in

12  this proclamation"; 3) "grazing permits on Federal lands within the monument south of

13  Interstate Highway 8 shall not be renewed at the end of their current term"; and 4)

14  "grazing on Federal lands north of Interstate 8 shall be allowed to continue only to the

15  extent that the [BLM] determines that grazing is compatible with the paramount purpose

16  of protecting the objects identified in this proclamation."  Proc. No. 7397, 66 Fed. Reg. at

17  7356.  Those directives, as well as the standards set forth in FLPMA and other applicable

18  statutes concerning the BLM's management of federal lands, are sufficiently specific and

19  objective to subject agency action or inaction taken in violation of Proclamation No. 7397

20  to judicial review under the APA.

21         **C.  Section 325 & the Renewal of Grazing Permits**

22         The BLM also argues that Section 325 of the Department of the Interior and

23  Related Agencies Appropriations Act of 2004 bars WWP's claims relating to the grazing

24  compatibility determination and BLM's renewal of grazing permits on the Sonoran Desert

25  National Monument.

26         Section 325 requires the BLM to renew under FLPMA all grazing permits and

27  leases set to expire during fiscal years 2004-2008 until such time as the BLM is able to

28  fully process the permits in compliance with "all applicable laws and regulations."  Pub.

1   L. No. 108-108, 117 Stat. 1241, § 325 (Nov. 10, 2003).  Section 325 also leaves to the

2   Secretary the "sole discretion [to] determine the priority and timing for completing [the]

3   required environmental analysis of grazing allotments based on the environmental

4   significance of the allotments and funding available to the [BLM] for this purpose."  Id.

5          First, WWP contends that the language in Section 325 concerning "all applicable

6   laws and regulations" and "required environmental analysis" refers only to "procedural

7   laws such as NEPA."  (Dkt. #32, p.8).  Second, WWP points to the fact that Section 325

8   requires that grazing permits are to be renewed under Section 402 of FLPMA, 43 U.S.C.

9   § 1752, which states that permits issued for livestock grazing on public lands must be

10  "consistent with the governing law," and that "[n]othing in [Section 325] shall be deemed

11  to alter the statutory authority of the Secretary of the Interior . . . ."  Pub. L. No. 108-108,

12  117 Stat. 1241, § 325.  Finally, WWP argues that "[h]ad Congress intended to repeal or

13  suspend all environmental laws, it easily could have done so – such as by including the

14  phrase 'notwithstanding any other provision of law' as it did in other sections of the 2004

15  Interior appropriations bill, but not in Section 325."  (Dkt. #32, p.6).

16         However, WWP's interpretation of Section 325 cannot be easily squared with its

17  text.  While WWP is correct that "[r]epeals (or suspension) of legislation by implication

18  are disfavored, especially 'when the claimed repeal rests solely on an Appropriations

19  Act,'" Forest Guardians v. Babbitt, 174 F.3d 1178, 1192 (10th Cir. 1999) (quoting

20  Tennessee Valley Authority v. Hill, 437 U.S. 153, 190 (1978)), in enacting Section 325

21  "Congress unequivocally required the Secretary of the Interior to renew any expired,

22  transferred or . . . waived grazing permit whatever the Secretary's progress in 'processing

23  . . . such permit . . . in compliance with all applicable laws and regulations.'"  Great Old

24  Broads For Wilderness v. Kempthorne, 452 F. Supp. 2d 71, 80-81 (D.D.C. 2006) (quoting

25  Pub. L. No. 106-113, §123, 113 Stat. at 1501A-159).  In Oregon Natural Desert

26  Association v. United States Forest Service, the district court held that "[t]he NEPA

27  requirement for re-issuing a grazing permit has been held in abeyance by Congress with

28  instruction to federal agencies to work on reducing the backlog of NEPA analysis."  2005

1  WL 1334459, at 12 (D. Or. 2005) ("ONDA I").  A subsequent ruling from the District of

2  Oregon affirmed that holding, similarly stating that under Section 325, "Congress

3  provided for continued grazing on permitted federal allotments under otherwise invalid

4  grazing permits by withholding the need for the requisite NEPA analysis upon the re-

5  issuance of a grazing permit."   Oregon Natural Desert Association v. United States

6  Forest Service, 2005 WL 1459328, at 9 (D. Or. 2005) ("ONDA II").  As such, WWP

7  asserts that Section 325 only tolls requirements under NEPA and other procedural laws.

8  But the ONDA cases do not support that assertion; they do not restrict the tolling

9  language concerning "all applicable laws and regulations" and "required environmental

10  analysis" to "procedural laws such as NEPA."

11        In addition, Forest Guardians v. Veneman does not support WWP's interpretation

12  and application of Section 325.  305 F. Supp. 2d 1118 (D. Ariz. 2003).  In that case, the

13  district court held that despite the requirement in Section 504 of the Rescissions Act of

14  1995 that "[n]otwithstanding any other law" grazing permits must be renewed despite

15  failure to complete the required analysis under "NEPA and other applicable laws,"

16  Section 504 did not constitute a broad exemption from all environmental laws that might

17  on their own require modification of the permits.  305 F. Supp. 2d at 1121 (quoting

18  Recessions Act § 504, Pub. L. No. 104-19, 109 Stat. 194, 212 (July 27, 1995)).  The

19  district court also held that "[t]he Recessions Act did not suspend Defendant's duty to

20  comply with the ESA . . ."  Id.  In other words, Forest Guardians held that Section 504

21  neither exempted nor suspended the Forest Service's duty to comply with relevant

22  environmental laws.  Instead, the court held that "[t]he Recessions Act only provides a

23  limited grace period of validity for grazing permits that expire and must be renewed prior

24  to the relevant environmental (NEPA or ESA) analysis being completed."  Id. at 1122.

25        Similarly, here Section 325 does not constitute a broad exemption from all

26  environmental laws that might on their own require modification of grazing permits.

27  Neither does Section 325 completely suspend the BLM's duty to comply with directives

28  in Proclamation No. 7397 to issue a grazing compatibility determination.  Like Forest

1    <u>Guardians</u>, Section 325 merely provides a limited grace period of validity for grazing

2    permits that expire and must be renewed prior to the relevant environmental analysis,

3    such as the compatibility determination, being completed.[6]  This temporary tolling is

4    confirmed by the fact that Section 325 specifically states that permits "may be canceled,

5    suspended or modified . . . to meet the requirements of such applicable laws and

6    regulations" once the processing of the permits is complete.  Pub. L. No. 108-108, 117

7    Stat. 1241, § 325.  In essence, Section 325 changes the relevant environmental analysis

8    that applies to grazing permits from a condition precedent into a potential condition

9    subsequent; the analysis still has to occur, but for the time being, not prior to renewal of

10    the permits.

11          In <u>Western Watersheds Project v. Bennett</u>, however, the court held that

12    appropriations riders such as Section 325 do not "divest [the] Court of jurisdiction to

13    apply FLPMA" because the renewals are to be made pursuant to FLPMA, which in turn

14    states that renewals must be "consistent with the governing law."  2008 WL 2003114, at

15    *7 (D. Idaho 2008).  The court based its holding on an earlier finding with respect to

16    Section 142 of the 2004 Interior appropriations bill, stating that "[b]oth riders contain

17    identical language that renewals are issued pursuant to 'Section 402 of [FLPMA] and

18    section 3 of the Taylor Grazing Act . . .'"  <u>Id.</u>  But Section 142 is not identical to Section

19    325.  In fact, although Sections 142 and 325 contain some similar language, not only does

20    Section 325 not mention the Taylor Grazing Act of 1934, but Section 142 does not

21    contain language concerning the tolling of "all applicable laws and regulations" with

22    respect to the renewal of grazing permits on federal land.  Furthermore, if the Court were

23    to accept WWP's argument and the district court's holding in <u>Western Watersheds</u>, then

24    Section 325 would present the BLM with "the choice of (1) acting unlawfully by

25

26          [6]Under Section 325, the "limited grace period" is fiscal years 2004-2008.  Pub. L. No.

27    108-108, 117 Stat. 1241, § 325.  However, the Court recognizes WWP's frustration that that "limited" period has consistently been extended by Congress through appropriations riders

28    since the Monument's inception in 2001.

1  renewing the relevant permits and thereby violating [the Proclamation]; or (2) acting

2  unlawfully by delaying renewal of the relevant permits to allow compliance with [the

3  Proclamation], and thereby violating [Section 325]."  Great Old Broads, 452 F. Supp. 2d

4  at 81.  As the district court stated in Great Old Broads, however, "[t]his makes no sense.

5  Through the enactment of the riders, Congress amended 'all applicable laws' to require

6  reissuance of expired, transferred or waived grazing permits prior to the completion of

7  otherwise required actions."  Id.  Accordingly, the Court holds that Section 325 bars

8  WWP's claims relating to the BLM's renewal and processing of existing grazing permits

9  on the Sonoran Desert National Monument.

10        In the alternative, WWP argues that Section 325 does not apply to its claim of

11  unreasonable delay and unlawful withholding of the compatibility determination and

12  management plan because Section 325 applies only to the processing of grazing permits,

13  whereas the compatibility determination and management plan "do not equate to the

14  routine processing of individual grazing permits contemplated by the rider."  (Dkt. #32,

15  p.9).  To the extent, however, that the grazing compatibility determination constitutes a

16  precondition to the processing of grazing permits (i.e., if grazing is found to be

17  incompatible with protecting the objects identified in the proclamation, then grazing may

18  not continue), it does in fact appear to relate to Section 325's requirement that the BLM

19  reissue all expired, transferred or waived grazing permits prior to completion of the

20  processing of the permits in accordance with "all applicable laws and regulations" and the

21  "required environmental analysis."  In addition, Section 325 provides the Secretary of the

22  Interior with the "sole discretion" to "determine the priority and timing for completing

23  required environmental analysis of grazing allotments based on the environmental

24  significance of the allotments . . . ."  Pub. L. No. 108-108, § 325.  Thus, to the extent a

25  grazing compatibility determination constitutes an "environmental analysis of grazing

26  allotments based on the environmental significance of the allotments," Section 325 bars

27  WWP's claim for unreasonable delay and/or unlawful withholding of the compatibility

28  determination.

1     On the other hand, the preparation of a management plan does not appear to

2  amount to condition precedent to the renewal of grazing permits on the SDNM, and thus

3  is not barred by Section 325.  Proclamation No. 7397's directive concerning the

4  preparation of a management plan requires only that "[t]he Secretary of the Interior shall

5  prepare a management plan that addresses the actions, including road closures or travel

6  restrictions, necessary to protect the objects identified in [the] proclamation."  Proc. No.

7  7397, 66 Fed. Reg. at 7356.  It does not appear as though enforcing that directive on the

8  BLM would prevent the agency from renewing any existing grazing permits on the

9  monument as required under Section 325.  Therefore, as Proclamation No. 7397 is subject

10  to judicial review under the APA, and Section 325 does not appear to bar review of the

11  BLM's failure to, at the very least, *prepare* a management plan in accordance with the

12  directives in Proclamation No. 7397, WWP may proceed on its claim against the BLM.

13     Finally, WWP argues that "because the rider only addresses renewal of grazing

14  permits, WWP's challenges to BLM's annual authorizations are obviously not barred by

15  the rider.  Those annual grazing authorizations are final agency actions that can be

16  challenged independent of the permit renewals."  (Dkt. #32, p.11).  An annual grazing

17  authorization is "the consummation of a process that sets the parameters for the upcoming

18  grazing season and [ ] imposes legal consequences on the permit holder."  Oregon Natural

19  Desert Association v. United States Forest Service, 465 F.3d 977, 983 (9th Cir. 2006).  It

20  is uncontested that such authorizations are final agency action.  Id. at 986 ("[A]n [annual

21  operating instruction] is a final agency action subject to judicial review under § 706(2)(A)

22  of the APA.").

23     But annual grazing authorizations are an integral part of the permitting process, as

24  such authorizations are "responsive to conditions that the Forest Service could not or may

25  not have anticipated and planned for in the [ ] grazing permit, such as drought conditions,

26  timing and duration of rainfall over the grazing season, success or failure of habitat

27  restoration projects, water quality, or degree of risk to threatened or endangered species

28  affected by grazing."  Id. at 980-81.  As such, the Court agrees with the BLM that "[i]n

1  applying Section 325, it would make no sense to allow BLM to renew permits before

2  completing required analyses, but then subject annual authorizations to injunctions.  Such

3  an application would subvert the purpose of Section 325."  (Dkt. #34, p.11).

4  Furthermore, Section 325's delegation to the Secretary of the Interior the "sole

5  discretion" to "determine the priority and timing for completing required environmental

6  analysis of grazing allotments," would seem to apply as equally to annual authorizations

7  as it does to the renewal of grazing permits.  Pub. L. No. 108-108, § 325.  Therefore, the

8  Court holds that Section 325 applies equally to bar claims related to both grazing permits

9  and annual authorizations.

10       **Accordingly,**

11       **IT IS HEREBY ORDERED** granting in part and denying in part the BLM's

12  Motion to Dismiss.  (Dkt. #25).  WWP's second claim for relief is dismissed.  In addition,

13  WWP may proceed on its first claim for relief against the BLM only to the extent WWP

14  alleges a violation of the Sonoran Desert National Monument Proclamation for failure to

15  issue a management plan for the Monument.  (FAC ¶ 72(B)).

16       **IT IS FURTHER ORDERED** that WWP may, if necessary in light of the instant

17  order, file a motion for leave to file a Second Amended Complaint to state an additional

18  claim(s) under FLPMA.  WWP must file its motion no later than 30 days after entry of this

19  order.

20       DATED this 12th day of June, 2009.

_____
Mary H. Murguia
United States District Judge